## NATIONAL BANK *v.* HALL.

A., B., & Co., a firm engaged in selling live-stock on commission, authorized a bank to cash drafts drawn on the firm by C., their agent, who forwarded live-stock to them. Some controversy arising, A., B., & Co. wrote to the bank as follows : —

> "JAN. 15, 1876.
>
> "Hereafter we will pay drafts only on actual consignments. We cannot advance money a week in advance of shipment. The stock must be in transit so as to meet dr'ft same day or the day after presented to us. This letter will cancel all previous arrangement of letters of credit in reference to C."

The cashier of the bank replied as follows : —

> "JAN. 17, 1876.
>
> "Your favor of the 15th received. I note what you say. We have never knowingly advanced any money to C. on stock to come in. Have always supposed it was in transit. After this we shall require ship'g bill."

There was no further communication on this subject between the parties. Two clerks of A., B., & Co. who were aware of this correspondence became partners without the knowledge of the bank, and the business was thereafter carried on in the same name. C. continued to draw on the firm as before, and the bank, without requiring bills of lading, to cash the drafts, all of which were accepted and paid by the firm. The bank acted in good faith. C. absconded with the proceeds of two drafts, and the firm brought this action against the bank to recover the amount. *Held*, 1. That the letters constitute no contract, and the bank is not responsible to the firm for cashing the drafts without bills of lading attached. 2. That if, however, a contract did arise from the cashier's unanswered letter of Jan. 17, 1876, it was with the then existing firm, and ceased on the subsequent change thereof by the admission of new members, without the knowledge or the consent of the bank.

ERROR to the Circuit Court of the United States for the Southern District of Illinois.

The facts are stated in the opinion of the court.

Submitted by *Mr. William McFadon* for the plaintiff in error, and by *Mr. J. A. Sleeper* and *Mr. J. K. Whiton* for the defendants in error.

MR. JUSTICE SWAYNE delivered the opinion of the court.

This is an action of tort growing out of a contract. The bill of exceptions is well drawn, and reflects clearly the points in issue between the parties. A brief statement of the case, as it appears in the record, will be sufficient for the purposes of this opinion.

During the years 1874, 1875, and up to April 1, 1876, a firm under the name of Hall, Patterson, & Co. had existed at Chicago. It consisted of S. Frank Hall, Frank D. Patterson, and Augustus L. Patterson, three of the five defendants in error. Their business was selling live-stock on commission at the Chicago stock-yards. William G. Melson was their agent at Quincy. To secure consignments at that point to his principals it was frequently necessary to make advances there. Hall, Patterson, & Co. arranged with The First National Bank of Quincy to cash Melson's drafts on them for this purpose. The drafts were numerous, and were all payable at sight. Penfield was the cashier of the bank. A draft for $125 was returned to the bank unpaid. This gave rise to some controversy between the bank and the drawees, but the matter was satisfactorily adjusted. Thereafter Hall, Patterson, & Co. addressed a letter to the cashier, which was as follows:—

"CHICAGO, Jan. 15, 1876.

"U. S. PENFIELD, *Cashier*, Quincy, Ill.:

"DEAR SIR,—Hereafter we will pay drafts only on actual consignments. We cannot advance money a week in advance of shipment. The stock must be in transit so as to meet dr'ft same day or the day after presented to us. This letter will cancel all previous arrangement of letters of credit in reference to G. W. Melson. Please acknowledge receipt of this, and oblige,

"Yours respectfully,

"HALL, PATTERSON, & Co."

Penfield replied as follows : —

"QUINCY, ILL., Jan. 17, 1876.
"MESSRS. HALL, PATTERSON, & Co., Chicago:

"DEAR SIR,'— Your favor of the 15th received.    I note what .
you say.    We have never knowingly advanced any money to Mel-
son on stock to come in.    Have always supposed it was in transit.
Have always taken his word.    After this we shall require ship'g
bill.                            Very truly yours,
                                    "U. S. PENFIELD, *Cashr*."

This letter closed the correspondence.

On the 1st of April, 1876, two of the defendants in error,
Frazee and Greer, were added as partners to the firm of Hall,
Patterson, & Co., as it had before existed.    They had previously
been employed as clerks, and knew of the writing of the letter
to Penfield of the 17th of January, 1876.    The new firm con-
tinued to do business under the name of Hall, Patterson, &
Co., until after this suit was commenced.    Melson acted as
the agent of the new firm as he had acted for the old one.
Between the 1st of April, 1876, and the happening of the loss
out of which this controversy has arisen, he, as such agent, drew
thirty-one drafts on his principals, amounting in the aggregate
to $50,000.    They were all at sight, were cashed by the bank,
and were duly accepted and paid by Hall, Patterson & Co.
There was no communication personally or by letter between
any officer of the bank and any member of the firm, from
the date of the cashier's letter of the 17th of January, 1876,
until after the loss before mentioned.    In the mean time, the
bank was wholly ignorant of the change which had been
made in the firm, and the drafts were cashed without such
knowledge.

On the 7th of December, 1876, Melson drew drafts as fol-
lows : —

"$2,505.                          QUINCY, ILL., Dec. 7, 1876.

"Pay to the order of U. S. Penfield, Cas., twenty-five hundred
and five dollars on account Jos. Hunnele 5 l'ds stock.
                                    "W. G. MELSON.
"To HALL, PATTERSON, & Co., Stock-yards, Chicago, Ills."

" $2,004.00.                    QUINCY, ILLS., Dec. 7, 1876.

" Pay to the order of U. S. Penfield, Cas., two thousand and four dollars on account S. C. Fooley 4 l'ds hogs and cattle.

                                      " W. G. MELSON.

"To HALL, PATTERSON, & Co., Stock-yards, Chicago, Ills."

. Both these drafts were cashed by the bank on the day of their date, and the proceeds were paid to Melson. They were taken in the usual course of business and in entire good faith. The cashier testified that by " ship'g bill," in his letter of the 17th of January, 1876, he meant bill of lading, but that no bill of landing was taken by the bank after the date of that letter, and that all Melson's drafts — being thirty-one after the 1st of April, and ten or twelve between January 17 and April 1 of that year — were paid by Hall, Patterson, & Co. without bills of lading being attached, and without inquiry by the bank or its cashier concerning such securities. When the two drafts last mentioned were cashed the cashier had no knowledge whether they were drawn against stock or not. It was a rule of the bank, understood by all the stock agents doing business there, that no draft should be drawn unless the stock was in transit. Agents, when drawing, were, therefore, not usually questioned upon the subject. Their compliance with the rule was assumed by the bank. The two drafts last mentioned were indorsed and transmitted by the cashier to his correspondent in Chicago for collection. They were accepted and paid by Hall, Patterson, & Co., and the plaintiff in error received the money. No stock was forwarded by Melson. The transaction was a fraud on his part. Upon receiving the proceeds of the drafts he fled the country. He was diligently sought for, but could not be found. Hall, Patterson, & Co. brought this suit against the bank to recover the amount they had paid. A verdict and judgment were rendered in their favor in the court below, and the bank has brought the case here for review.

The bill of exceptions contains all the evidence given upon the trial. It discloses nothing which affords the slightest ground for any imputation against the bank or its officers with respect to their good faith and fair dealing in the transaction

out of which this controversy has arisen. The defendants in error claimed nothing in that respect in the court below, and they have made no such claim here.

The counsel for the bank has assigned twenty-seven errors. Some of them .are repetitions of the same objections in different forms. None of them are frivolous, and many of them, if the exigencies of the case required it, would be entitled to grave consideration by this court.

The two letters between the parties, of the 15th and 17th of January, 1876, are the heart of the controversy. The stress of the case is upon their construction and effect. Passing by the other points raised in the record, we shall first give our attention to this subject, and our remarks will be confined to that and one other of the errors assigned.

By this letter Hall, Patterson, & Co. advised 'the bank: 1. That thereafter they would pay drafts only on actual consignments of stock; 2. That they would not pay money a week in advance of shipments; 3. That the stock must be in transit, so as to meet the draft the same day or the day after it was presented to them; 4. That this letter was to cancel all previous letters of credit as to W. G. Melson; 5. They asked an acknowledgment of the receipt of the letter.

These terms were clear and explicit. What was the reply of the bank?

The cashier answered: 1. That the letter of the other party was received; 2. That its contents were noted; 3. That the bank had never knowingly advanced money to Melson on stock to come in; 4. That the cashier had always taken Melson's word; 5. That thereafter the bank would require a " ship'g bill," meaning a bill of lading. This letter Hall, Patterson, & Co. never answered.

What was its effect as to them? It certainly did not accept their proposition, nor accede to their terms, that " the stock must be in transit to meet the draft on the same day or the day after presented." They made this expressly the condition of their accepting. The letter made no allusion to the requirement, and was wholly silent on the subject. Upon this point the parties were as wide asunder as if the letters had not been written.

For whose benefit was the shipping bill mentioned by the cashier to be taken? *Prima facie* the point is left in uncertainty. Here again the cashier is silent. But the interpretation is reasonable that Hall, Patterson, & Co., having in advance refused to accept, except upon the condition mentioned, the bank notified them in reply that it would thereafter take a bill of lading, not for their protection, but for its own. This view is strengthened by the conduct of the defendants in error, and the practical construction which they seem to have thus given to the clause. They did not say in reply that they understood the shipping bill was to be for their benefit, and that they should expect it to accompany the draft. No such bill was ever required by them or sent by the bank. They went on accepting and paying in silence exactly as before. The large number of drafts so accepted and paid by them has been already stated. If they relied on the shipping bills their conduct is inexplicable. If the understanding of the cashier had been different from what we have suggested, it is hardly to be supposed he would, from the date of his letter, have constantly disregarded his promise. Such conduct would have been worse than negligence. It would have been a gross breach of good faith to the other party. If, on the other hand, he meant by the clause that the bill of lading, if taken, was to be solely for the security of the bank, then it was for the bank to determine whether it should be required or not. If the cashier had confidence in Melson, and chose to exercise it, he exposed the bank to the hazard of the consequences; but there was certainly no responsibility to Hall, Patterson, & Co.

It is a remarkable feature of the case that, when the loss occurred, the defendants in error attached no importance to their own letter, but fell back upon the letter of the cashier which they had not answered, and which they had not before in any manner recognized as concerning them, much less as constituting a contract by the bank for their protection and benefit. To give it that effect, early and explicit notice to the bank was necessary. The afterthought of Hall, Patterson, & Co., when the loss occurred, came too late, and cannot avail them. *Adams* v. *Jones*, 12 Pet. 207; *McCollum* v. *Cushing*, 22 Ark. 540; *White* v. *Corlies*, 46 N. Y. 467; Story, Contr., sect. 1130.

The minds of the parties, as shown by these letters, moved on parallel, not on concentric lines. There was not the meeting of minds and the mutuality of assent to the same thing, which are necessary to create a contract. It is not pretended that the bark ever agreed to the proposition — if it may be considered such, and not the mere announcement of a purpose — contained in the letter of Hall, Patterson, & Co., and there is no evidence that the proposition of the bank — if the letter of the cashier can be regarded in that light — was ever accepted and acted upon by the parties to whom it was addressed. We are satisfied, however, that no proposition or promise was intended to be made by the bank, and that this was the understanding of the defendants in error. Their letter revoked the letter of credit they had before given to Melson. The bank announced, in reply, the manner in which it should thereafter do business with him. Thereafter, each occupied a position independent of the other. If the bank discounted drafts for Melson, the defendants in error, like any other drawees, had the option to accept or not, and in the latter event the bank could have had no redress against them, whether it had, or had not, taken a bill of lading. The destruction of the stock, after the bank took such a bill, would not have changed the relations of the parties. In our view, it was a thing with which the defendants in error had nothing to do.

If it be said they were obliged to accept if the bank took a shipping bill, it may be asked in reply, Where is the evidence of such an understanding on their part? There is nothing in the record that gives the slightest support to such an assumption. If they were not bound, where is the consideration for the alleged promise of the bank? The true view of the subject is that neither was in anywise bound or liable to the other.

The defendants in error notified the bank that thereafter they would accept only on the condition specified. The cashier answered, that the bank would protect itself. This is the sole effect of the letters. Thereupon the correspondence of the parties ceased, because there was nothing left for either to add.

Where there is a misunderstanding as to the terms of a contract, neither party is liable in law or equity. *Baldwin* v. *Milde-*

*berger,* 2 Hall (N. Y.), 176; *Coles* v. *Bowne,* 10 Paige (N. Y.), 526; *Utley* v. *Donaldson,* 94 U. S. 29.

Where a contract is a unit, and left uncertain in one particular, the whole will be regarded as only inchoate, because the parties have not been *ad idem,* and, therefore, neither is bound. *Appleby* v. *Johnson,* Law Rep. 9 C. P. 158.

A proposal to accept, or acceptance upon terms varying from those offered, is a rejection of the offer. *Baker* v. *Johnson County,* 37 Iowa, 186. See also *Jenness* v. *Mount Hope Iron Co.,* 53 Me. 20; *The Chicago & Great Eastern Railway Co.* v. *Dane,* 43 N. Y. 240; and *Suydam* v. *Clark,* 2 Sandf. (N. Y.) 133.

The learned judge who tried the case below instructed the jury that the letters constituted a binding contract, and that if the bank cashed any bills not based on actual consignments to the plaintiffs, and the plaintiffs sustained any injury by such failure, the bank is responsible.

This instruction was erroneous.

In making a contract, parties are as important an element as the terms with reference to the subject-matter. Mutual assent as to both is alike necessary. If, in fact, there were here, as claimed, a contract with reference to the latter, it was made on the 17th of January, 1876, with Hall and the two Pattersons, then constituting the firm known as Hall, Patterson, & Co. The change of the firm on the 1st of April following, by taking in Frazee and Greer as new members, without the knowledge or consent of the bank, put an end to the contract as to the latter. The proof is conclusive that the bank had no knowledge of the change until after commencement of this suit. The alleged cause of action arose more than eight months after the new partnership was formed, and nearly a year after the date of the letters by which the contract is claimed to have been made. There was no privity between the bank and the new firm. There was no binding acquiescence by the bank. There could be none without knowledge, and it is not claimed or pretended that such knowledge existed. A new party could no more be imported into the contract and imposed upon the bank without its consent, than a change could be made in like manner in the other pre-existing stipulations. The bank might

have been willing to contract with the firm as it was originally, but not as it was subsequently.  At any rate, it had the right to know and to decide for itself.  Without its assent a thing was wanting which was indispensable to the continuity of the contract.  *Barns et al.* v. *Barrow*, 61 N. Y. 39; *Grant* v. *Naylor*, 4 Cranch, 224; *Bleeker* v. *Hyde*, 3 McLean, 279; *Taylor* v. *Wetmore*, 10 Ohio, 490; *Taylor* v. *McClung*, 2 Houst. (Del.) 24; *Hunt* v. *Smith*, 17 Wend. (N. Y.) 179; *Cremer* v. *Higginson*, 1 Mas. 323; *Russell* v. *Perkins*, id. 368.

The court refused an instruction asked for in accordance with this view of the subject.  This, also, was an error.

The judgment will be reversed, and the cause remanded to the court below with directions to proceed in conformity to this opinion; and it is

*So ordered.*