# Richmond.

EDICHAL BULLION CO. V. COLUMBIA GOLD MINING CO.

April 9th, 1891.

1. SPECIFIC PERFORMANCE—*Sales of realty—Case at bar.*—Bills for specific performance of contracts for sale of land must show that there were concluded between the parties written and signed contracts that are reasonable, and clear, and definite both as to terms and subject matter, and mutual in obligation and remedy; and the same must be proved as alleged. In the case here, these essentials are lacking.

2. CONTRACTS—*Terms proposed.*—If offer be upon payments at certain times. and party selling requires shorter times, there is no contract, and offerer is not bound.

3. EQUITABLE RELIEF—*Variance—Case at bar.*—Where bill expresses desire that, if corporation is *not* bound by the purchase alleged, *then, in that event,* the court shall hold the individual corporators liable, and the decree is against both corporation and individual corporators: *held,* error, because decree must be on the case made by the pleadings, although the evidence may show a right to a further decree. *Mundy* v. *Vawter,* 3 Gratt., 494.

4. PRINCIPAL AND SURETY—No individual liability can attach to incorporators as sureties on a contract which does not bind the corporation.

5. NON-RESIDENTS—*Personal decrees.*—Where non-resident defendants are not served with process, and do not in any way appear, the fact that they gave their depositions in the cause, does not warrant a personal decree against them.

Appeal from decree of circuit court of Fluvanna county, rendered April 12th, 1889, in the chancery cause on an attachment, wherein the Columbia Gold Mining Company, a corporation, was complainant, and the Edichal Bullion Com-

pany, a corporation chartered under the laws of the State of New Jersey, and J. B. Baker, J. W. Woodside and M. R. Kirkpatrick, non-residents, were defendants. The decree being adverse to the defendants, they appealed. Opinion states the case.

*Wm. B. Pettit* and *W. W. Henry*, for the appellants.

*T. S. Martin* and *A. A. Gray*, for the appellees.

FAUNTLEROY, J., delivered the opinion of the court.

The original bill was filed against the said Edichal Bullion Company, as a non-resident and foreign corporation, for the purpose of enforcing specific performance of an alleged contract for the purchase by it, from the said Columbia Gold Mining Company, of real estate lying in the counties of Goochland and Fluvanna, Va., known as the Tellurium gold mining property; and simultaneously with the institution of the suit, on the 9th day of July, 1886, an attachment was sued out and levied upon the interest which it was alleged the said Edichal Bullion Company owned in about 1,100 acres of land lying mostly in the said county of Fluvanna, known as the Bowles mining property and upon some personal property.

To the original bill, and two successive amended bills, filed by the complainants, the defendant company demurred and answered. The circuit court overruled the demurrer; and, by the decree complained of, held that there was a contract for the sale, by the Columbia Gold Mining Company, to the defendant, the Edichal Bullion Company, of the Tellurium gold mining property, as set forth in the bill to have been made on the 7th day of November, 1885; and decreed specific performance of the same by the defendant company; and also decreed against the individual members of the said defendant company as securities for the defendant company. The case, made by the

original and amended bills, was demurred to as wanting in all the essential requisites of a suit for specific performance—because it does not show that any distinct and definite contract of sale and purchase was made; nor when, where, how, and by whom, it was made; and that the person making it had authority to bind the defendant company; nor whether the alleged contract was by parol or in writing; nor whether there was any express contract made by the defendant company, or by any authorized agent for it—either by parol or in writing. It is merely stated, argumentatively, that inasmuch as H. H. Eames had, on the 7th day of February, 1885, procured a contract of lease from the complainant company, giving *him* the option of buying the Tellurium gold mining property, upon certain terms, within a limited time, and was, as they allege, the agent of the defendant company operating its machinery on the premises which he had leased, with the option to buy on or before the 7th day of November, 1885; and inasmuch as his said experimental operations were continued beyond the day upon which, by the express terms of his contract, his said option was to cease; therefore the said Edichal Bullion Company had become bound to buy and had bought the property, upon the terms stipulated in the written contract between the complainant company and its lessee, H. H. Eames, made more than six months before the defendant, Edichal Bullion Company, had any existence—in fact or in law. That the bills do not show that Eames, himself, within the time limited, availed of his option to buy the property, by notice to that effect, or by offering to pay the purchase-money; nor that the complainant company was, on the next day, after the expiration of the optional contract with Eames, under any obligation to sell to him; much less that it was under any obligation to sell the property to the defendant, Edichal Bullion Company.

In the case of the *Chilhowie Iron Company* v. *Gardner*, 79 Va., Judge Lacy, speaking for this court, said : "Can there be

a contract without mutual obligation? Can there be an agreement between two parties which binds one of them absolutely, and the other only at his pleasure? Upon this ground, no specific performance could properly have been decreed, since the want of mutuality in the contract should be considered a valid objection to the exercise of that jurisdiction."

After charging, *arguendo*, that the defendant company had, on the 7th of November, 1885, become the purchaser of the property in question, *on the terms named in said contract* (with Eames), to-wit, $15,000, of which $7,500 to be paid in cash, and the residue in three months, with interest, the bill refers to certain letters that afterwards passed between some of the officers of the respective companies, and to an *unsigned* memorandum; which are not exhibited with, or made part of, the bill; nor claimed as constituting the contract sought to be enforced; but as rendering plain that the defendant, Edichal Bullion Company, had agreed to take the property on the terms named in the contract with Eames, and only were negotiating for the times of making payments. The times of making payments are an important and essential element of a contract for the sale or purchase of real estate; so essential that a failure to agree, and distinctly to state, as to them, is a failure to agree upon any contract at all.

The bill, and the correspondence referred to in it, show a failure to agree upon these important particulars of the alleged contract. And this reference further shows, that no contract had been made on the 7th of November, as argued in the bill there had been, for it shows that, on the 7th of November, 1885, the complainant company agreed with their lessee, Eames, to extend his option which, under their written contract with him, would expire on that day, until the 12th of November; and that from the 13th of that month, to the 31st of December, 1885, the officers of the respective corporations were in treaty about the sale and terms of purchase of the property, and

were never at one about them. (See *South Boston Iron Company* v. *U S.*, 118 U. S., 40–2.) "Until the terms of an agreement have received the assent of both parties, the negotiation is open, and imposes no obligation on either." "If it be doubtful whether an agreement has been concluded, or is a mere negotiation, chancery will not decree a specific performance. The principle is a sound one, and especially applicable in a case like this, where the party attempting to enforce the contract has done nothing upon it." *Carr* v. *Duval*, 14 Peters, 83.

The case of *Carr* v. *Duval, supra,* was one in which the contract was sought to be, like the case at bar, deduced from correspondence, which was conducted, on the side of the parties against whom a specific performance was sought by one who, in the language of the court, "was acting not for himself, only, but for his sisters and brothers without any express authority from them."

The same learned judge, in delivering the opinion of the court in the case of *Colson* v. *Thompson*, 2 Wheat., 336–341, said, "The contract, which is sought to be specifically executed, ought not only to be proved, but the terms of it should be so precise, as that neither party could reasonably misunderstand them. If the contract be vague or uncertain, or the evidence to establish it be insufficient, a court of equity will not exercise its extraordinary jurisdiction to enforce it; but will leave the party to his legal remedy." In the case of *Williams* v. *Morris*, 95 U. S., 444–456, Clifford, J., said: "The proof as to the terms of the contract must be clear, definite and conclusive, and must show a contract leaving no *jus deliberandi*, or *locus penitentiæ;* and on page 57, must clearly and satisfactorily show "the existence of the contract as laid in the pleadings," and "the particular agreement charged in the bill or answer."

Relief in suits for specific performance is not granted by courts of equity *ex debito justitiæ,* but under the sound discretion

of the court. (*Shenandoah Valley '.R. R. Co.* v. *Lewis*, 76 Va., 835; *Chilhowie Iron Co.* v. *Gardner*, 79 Va., 309.)

In granting such relief, the very first thing that is required, is that the complainant shall set forth and prove a contract certain and definite in its terms. (*Literall* v. *Jackson*, 80 Va., 612.)

The bill for specific performance of a contract made with an agent must, on its face, distinctly state the contract that was made; and show when, where, how, and by whom, it was made; and that the person making it had authority to bind the company. *Haden* v. *Farmers and Mechanics Fire Association*, 80 Va., 683. In order that a contract can exist there must be a *consensus* between the parties. Their minds must agree at the same moment to the terms constituting the contract. "The parties must agree to the same thing at the same time." 4 Minor, 16. "The assent must be to the precise terms offered." 3 Minor, 126. "Where there is a misunderstanding as regards the terms of a contract, neither party is liable, in law or equity." (*National Bank* v. *Hall*, 101 U. S., 50.)

"Contracts for sale of real estate must be in writing, signed by the party to be charged, or his agent." Code 1873, p. 985.

The case stated in the complainant's bills, falls far short of measuring up to these requisites of the law in this State as settled by the decisions of this court;. and the circuit court erred in overruling the demurrer to the bills; and, as said by Judge Richardson in delivering the opinion of this court in the case of *Litterall* v. *Jackson*, *supra*, "In no view does the alleged contract, whether looked at, by itself, or in the light of surrounding circumstances as disclosed by the testimony, come up to the standard which is necessary to its capability of specific execution." Citing *Pigg* v. *Corder*, 12 Leigh, 69; *Graham* v. *Call*, 5 Munf., 396; *Wright* v. *Puckett*, 22 Gratt., 347.

The demurrer to the bills should, upon these authorities, have been sustained; but, upon the answers and the proofs,

the complainant's case is without facts, justice, law or equity to support it.

The record shows that H. H. Eames claimed to have invented a process, or machinery, for reducing ores and extracting their precious metals, which was very valuable. On the 7th day of February, 1885, long before the Edichal Bullion Company was formed, or even the act of the legislature of the State of New Jersey authorizing it to be formed, was enacted, the complainant, the Columbia Gold Mining Company, gave to the said H. H. Eames a lease and option of purchase upon their "Tellurium" property in Fluvanna county, for six months, with a view to its development, and the testing of his invention. That option to Eames expired on the 7th of August, 1885; and it was verbally extended to Eames to the 7th of November, 1885. There is not the slightest evidence in the record of any assignment of the said option in writing to the defendant Edichal Bullion Company, or of any determination expressed in writing by or on behalf of the said defendant company, on or before the said 7th of November, 1885, to take the said property in accordance with the terms of Eames' said option, which terms were $15,000, one-half cash, and the residue at three months, with interest. On the contrary the record of the proceedings of the Columbia Gold Mining Company at a "stockholders meeting, November 7th, 1885, shows, that Mr. H. H. Eames was present, and asked for, and obtained, ' an extension of the time on the contract *with him*,' which would expire to-day, until next Thursday, the 12th inst.;" and on the 13th day of November, 1885, Mr. Baker, the president of the Edichal Bullion Company, was in consultation with the officers of the Columbia Gold Mining Company, at which consultation, a memorandum of the proposal of terms for the sale of the Tellurium gold mining property of the Columbia Gold Mining Company to the Edichal Bullion Company was reduced to writing by Mr. Shepherd,

one of the Columbia Gold Mining Company, but which was not signed by any one, to-wit—the purchase of the property by the defendant company at $15,000—one-half to be paid in three months; one-quarter to be paid in four months; and the remainder in five months, with interest from the 7th of November, 1885. This memorandum, Mr. Baker, the president of the Edichal Bullion Company, took with him to Philadelphia, telling the Columbia Gold Mining Company at the said meeting, on the 13th inst., that he had no authority to contract or commit his company, without a consultation with and by instructions from them. That when he left Philadelphia on the 9th inst., to go to the mines in Fluvanna county at the request of Mr. Eames, he had no idea of visiting Richmond, or of negotiating for the purchase of the Tellurium property. That he had arrived at the mines on the 10th inst., and had come to Richmond to see the Columbia Gold Mining Company in the interest of, and at the request of, Mr. Eames, to try to obtain an extension of his option contract, to enable him further to experiment and test the value of his machinery and mining operations, for which they, the Edichal Bullion Company, had been induced by Eames' glowing accounts of actual and expected products, to advance to him large sums of money. This memorandum, unsigned and not binding upon any one, Mr. Baker, upon his return to Philadelphia, laid before his company; and on the 18th of November, 1885, wrote the following letter: "The Columbia Gold Mining Company, Richmond, Va. Gents.—We will agree to the terms of your mem. for the sale of the Tellurium property, except to the time of the payments of notes, which we propose as follows:

1st note November 7th, $3,750—4 months. ·
2d     "       "       "     3,750—5     "
3d     "       "       "     3,750—6     "
4th    "       "       "     3,750—7     "

All these notes to bear interest at six per cent. per annum. Wo to have the privilege of taking up the notes before maturity. Trusting this will be satisfactory. Yours truly,

EDICHAL BULLION COMPANY,

J. W. WOODSIDE, Secretary.

To this letter—containing the only proposal in writing ever made by the Edichal Bullion Company to purchase the Tellurium property of the complainant, a positive and unqualified refusal was made, in a letter dated November 19th, 1885, and signed C. E. Belvin, president—addressed to Mr. J. W. Woodside, secretary, 135 Arch street, Philadelphia. "Dear sir: Yours 18th inst. received this P. M., &c. In reply, I beg to say, that I, at once, called a meeting of our company, and I am authorized to say, that they will have to decline to make any alteration in the terms as stated in the memo. handed your president, Mr J. B. Baker, and accepted by him, at Ford's Hotel, in this city, on last Friday morning, 13th inst.," &c.

To this, Mr. Baker, president, replied in a letter, dated Philadelphia, November 23d, 1885, addressed to C. E. Belvin, president, Richmond, Va.

" On my return to Philadelphia on the 15th inst., I laid the memo. referred to, before my colleagues, stating that I said to the gentlemen I met, that when I left Philadelphia, I did not expect to stop in Richmond, or see any of the persons interested in the sale of Tellurium mines; that I did not have any conversation with my colleagues in Philadelphia, with reference to the payments for the property, and that it would be necessary to have the approval of Mr. Woodside and Mr. Kirkpatrick before any agreement could be fully ratified, &c.

"Our board, after fully considering the terms in the memo., decided to ask your company to divide the first payment ($7,500) into two equal parts, making one to become due February 7th, '86, and the other at six months, for November 7th, '86, interest to be added in each from November 7th, '85. Our

company deems it injudicious to contemplate the payment of so large an amount of money in February, &c. It hopes that the Columbia Gold-Mining Company will reconsider its decision."

To this letter the Columbia Gold Mining Company, through its president, C. E. Belvin, replied as follows: "Mr. J. B. Baker, president Edichal Bullion Company, 135 Arch street, Philadelphia, Pa. Richmond, Va., November 25th, 1885. Dear sir: Your letter 23d received this day, and we have considered your proposition, and our board have agreed to accept your terms of payment, which we understand to be as follows:

$3,750 and int. at 3 months from Nov. 7th, 1885.
$3,750   "    "    " 4      "      "      "      "      "
$3,750   "    "    " 5      "      "      "    .  "      "
$3,750   "    "    " 6      "      "      "      "      "

If we are correct in this, please advise me promptly, and I will have the papers prepared at once."

It is seen, at once, that this letter of acceptance makes a material variation in the terms proposed in the letter from Baker; and Belvin, the president, speaking for the Board, shows that they were uncertain as to the terms of payment offered; and in its state of uncertainty, asked to be advised promptly whether it was correct, &c.

No reply was made to this, until the letter of 12th of December, 1885, written by Baker, President, addressed to C. E. Belvin, President, Richmond, Va., in which it is stated that the Edichal Board of Directors had and would defer action upon the proposal contained in the letter of Belvin, of the 25th November, 1885, until it could hear better accounts of the experimental working of the mine by Eames. The said terms proposed in the letter of 25th November, 1885, have never been accepted by the Edichal Company, and the subsequent correspondence between the two companies shows, con-

clusively, that no agreement was ever concluded between them.

"Where there is a misunderstanding as regards the terms of a contract, neither party is liable, in law or equity." *National Bank* v. *Hall*, 101 U. S., 49.

"A proposal to accept, or an acceptance, on terms varying from those offered, is a rejection of the offer." *N. Bank* v. *Hall*, 101 U. S., 50.

"A subsequent acceptance upon the terms offered does not make a contract." Amer. & Eng. Encyclopædia, Vol. III., p. 853 (title Contract).

"If the offer be upon payments at certain times, and the party selling requires shorter times, the party making the proposal is not bound." Story on Contracts, sec. 85, referring to *Bruce* v. *Pierson*, 3 Johnson, 534, and cases cited.

It appears from the record that Eames, who claimed to have invented valuable machinery, and who had a lease and option of purchase from the Columbia Gold Mining Company, of their Tellurium property, adjoining the Bowles property, owned by the Edichal Bullion Company, had deceived the last-named company in reference to what he was doing with his machine at the mines, and that it was because of his false but glowing statements, as to results obtained, that the Edichal Company ever thought of binding itself for the purchase-money. But, while negotiations were pending, the Edichal Company discovered that they had been deceived by Eames, and they refused to have anything to do with the purchase; and, after the failure of his scheme with the Edichal Company, Eames became a swift witness for the Columbia Gold Mining Company in their endeavor to force the Tellurium property upon the Edichal Company. The uniting of Eames as a defendant in a suit, asking for a specific performance against the Edichal Company, of which it is denied in the answer, and not proved in the evidence, that he was a member, or an agent to purchase, was obviously for the ad-

vantage of his sworn answer, which was called for on oath from him, while it was waived from the defendant company. He admits, upon cross-examination, that one of the attorneys for the Columbia Gold Mining Company prepared his answer, in which he is made to say, under oath, that the Edichal Bullion Company *did adopt* his contract with the plaintiff company for the sale and purchase of the Tellurium gold mine, and that, after the 7th of November, 1885, he was in full possession thereof, for and by the authority of said Edichal Bullion Company, and the mines were worked and operated for it, and with capital furnished by it; yet, when he is asked, "When did the Edichal Company adopt your contract?" he replied, "I do not know that they ever did." And when he is asked, "When did the Edichal Company give you authority to take possession?" he replied, "that, *as a company*, they never gave me such authority, but *individually* they did." And when he is asked, "Who did, and when, and what took place?" he replied, "Mr. Baker; at the time we were speaking of getting an extension of time on the option; he thought we might be able to manage the purchase, if the extension was granted." There is no proof in the record of any written contract by any of the defendants for the purchase of the property; and as to the alleged parol contract by the substitution or adoption of Eames' expired option, the answer to the original and first amended bills emphatically put in issue and deny the contract alleged, and, in the language of this court by Lewis, P., in the case of *Shenandoah V. R. R. Co.* v. *Lewis*, 77 Va., 833–837, "the evidence is too vague, uncertain and contradictory upon which to found a decree in chancery for the specific performance of a contract."

In the second amended bill Baker, Woodside and Kirkpatrick are made defendants, and the charge against them is, that they, individually, through Eames, purchased the Tellurium property and turned it over to the Edichal Bullion Company; and the prayer of the bill is, that "if, therefore,

your Honor shall be of the opinion that, for any reason, the defendant corporation is not bound by the alleged purchase of the Tellurium Gold Mining property, then complainant is desirous of holding the said corporators personally bound by it, authorized and sanctioned as it was by each one of them individually. They are responsible if the Edichal Company is not." So far from alleging, positively and clearly, a precise and definite contract of purchase, showing when, where, how, and by whom, and whether in writing or by parol, the bill, as a *dernier* resort, doubtingly, hesitatingly, and beseechingly expresses the alternative desire of the complainant, that if, by their pleadings and their proofs, they have made and sustained no case for specific performance against the defendant company, then to hold the individual corporators liable; and the decree of the court below is against both the defendant company and the individual persons as securities, thus establishing a liability not put in issue by the pleadings nor sustained by the proofs. The decree must be upon the case made by the pleadings—although the evidence may show a right to a further decree. *Nibb* v. *Dickson*, 1 Rand., 249; *Mundy* v. *Vawter*, 3 Gratt., 494.

Neither of these individual defendants in this third bill was served with process to answer it, and neither, by plea, demurrer, or answer, or in any way, entered an appearance. The fact that they appeared before a notary in Philadelphia to give their depositions did not authorize the court to give a personal decree again them. *Smith, &c.*, v. *Chilton*, 77 Va., 535. Any individual liability of Baker, Woodside and Kirkpatrick for the purchase price of the property, as securities for the defendant company, could not obtain under and by virtue of a contract which did not bind the company itself; and the memorandum of the 13th of November, 1885, made by Shepherd, a member of the complainant company, and unsigned by any one, and made merely, tentatively, as a basis for further negotiations, will not supply the imperative requirement of

the statute for a writing signed by the party to be bound or by his agent. Code of 1887, sec. 2840.

The complainant company have no equity in their case; the decree appealed from is wholly erroneous, and it is reversed and annulled; and the order of this court will be to abate the attachment, and to dismiss the bills with costs.

DECREE REVERSED.