## CRANFILL et al. v. SWANN PETROLEUM CO. (No. 2172.)*

(Court of Civil Appeals of Texas. Amarillo. June 27, 1923. Rehearing Denied Oct. 3, 1923.)

1. Joint-stock companies and business trusts ⇐⇒19—Capacity in which plaintiff sued not raised where answer not verified.

A plaintiff suing as a joint-stock association is not, under Rev. St. art. 1906, precluded from recovering by proof that it was, in fact, a trust estate, where defendants' answer raising such issue is unverified by affidavit.

2. Mines and minerals ⇐⇒57—Agreement to execute oil and gas lease held not established.

Correspondence constituting negotiations between parties looking to the execution of an oil and gas lease held insufficient to establish an agreement to execute such lease.

3. Contracts ⇐⇒32—If execution and delivery of instrument be intended as the consummation of the contract, no binding agreement results previous to that time.

If a requested execution and delivery of a particular instrument was proposed to be the consummation of the contract, and not a mere memorial of it, no binding agreement results without such execution and delivery.

Appeal from District Court, Wichita County; H. R. Wilson, Judge.

Action by the Swann Petroleum Company against J. B. Cranfill and others. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

Etheridge, McCormick & Bromberg, of Dallas, and Madden, Trulove, Ryburn & Pipkin, of Amarillo, for appellants.

Guy R. Holcomb and Weldon, McDonald & Cummings, all of Wichita Falls, for appellee.

KLETT, J. Swann Petroleum Company sued appellants, J. B. Cranfill, R. H. Beetham, and E. B. Ritchie, and obtained judgment against them for $8,000 for alleged breach of a written contract by which they agreed to execute and deliver to plaintiff an oil and gas lease on 160 acres of land in Wichita county, Tex. In addition to the

general issue, there was a plea of non est factum. Negotiations were initiated by plaintiff writing the following letter to defendant Cranfill:

"1003 American National Bank Bldg., Wichita Falls, Texas, January 10, 1922. Dr. J. B. Cranfill, Dallas, Texas—Dear Sir: We propose the drilling of a 1,800-foot test on the C. A. Peterson farm, section 13, Tarrant county school lands, Wichita county, adjoining which you own considerable land in fee. We have solicited the various owners of land immediately surrounding this section and in each case they have contributed to the drilling of this well by giving us a five-year oil and gas lease (producers 88 form) with a rental clause calling for the payment of $5.00 per acre per annum rental after the first year. Messrs. Knox and Lowrance who own the 320-acre tract adjoining your land in section 2 on the east have contributed a lease on 160 acres. Mr. Peterson, who owns a half section, has contributed 200 acres, and Mr. Williams, whose land lays to the south of Peterson, has contributed 200 acres. These leases, as well as the others we have taken in this community, are now escrowed in the First National Bank of Iowa Park, with our regular form contract, a copy of which is inclosed herewith for your information. That you might verify the above statements, please communicate with Mr. Tom Corridon, vice president of the First National Bank of Iowa Park, who holds these papers in escrow. The geological features of this vicinity are, in our opinion, most favorable for the finding of oil, and we are told that there has been drilled no tests of any importance to this land. We therefore feel that every landowner in this vicinity will be greatly benefited by this test and can contribute quite liberally as there is no demand for leases in this section of the country except near active development. We feel that, in proportion to amount of acreage contributed by others, your quota would be about 200 acres off the south end of your 320 acres in section 2, but we are content to leave this to your own judgment. Therefore will you kindly advise what you think would be a fair amount for you to contribute. By your contributing, you will have free access to this well, and we will gladly supply you with any information you may require. Yours truly, The Swann Petroleum Company, by [Signed] C. T. McLaughlin."

This letter inclosed for execution an oil and gas lease, known as "Producers' Form 88" and also the proposed contract. One paragraph of the contract reads as follows:

"Said lease shall be placed in escrow with this contract in the ——— bank of ———, Texas, to be held by said bank and to be delivered to party of the second part (plaintiff) when active drilling is begun upon this or another tract of land within a mile radius of this particular tract, and such bank is hereby expressly directed and authorized to deliver such lease to said party of the second part when this provision has been complied with."

The concluding paragraph of the contract appears as follows:

"Parties hereto have set their hands this ——— day of January, 1922, A. D. ———, Party of the First Part. Swann Petroleum Company, by Trustee."

The following correspondence then took place between plaintiff and the defendant Cranfill:

"Dallas, Texas, January 11, 1922. The Swann Petroleum Company, 1003 Amer. Natl. Bank Bldg., Wichita Falls, Texas—Gentlemen: Answering your kind letter in which you inclose form of lease, I beg to advise that I own only a one-half undivided interest in the land in Wichita county. I am sending your communication and inclosures to-day to my partner at Mineral Wells, and as soon as I have heard from him will advise you definitely what our decision in the matter will be. I agree with you that this is oil land, and I believe a deep test will disclose this fact. Very truly yours, J. B. Cranfill."

"1003 American Natl. Bank Bldg., Wichita Falls, Texas, January 23, 1922. J. B. Cranfill, 824 Wilson Bldg., Dallas, Texas—Dear Sir: We are in receipt of your letter of the 11th instant and note your encouraging remarks regarding our possibility of finding oil by the drilling of a deep test near your land in section 2, Tarrant county school lands, Wichita county. We, too, are very much enthused over the geological reports obtained in this part of the county and are anxious to get operations started at an early date. Therefore we will greatly appreciate your advising what we may expect from you in the way of some acreage out of section 2, as a contribution toward the development outlined in our letter of January 10th. Thanking you for your prompt consideration and co-operation in this project, we are, yours truly, The Swann Petroleum Company, by [Signed] C. T. McLaughlin, Trustee."

"Dallas, Texas, January 23, 1922. The Swann Petroleum Co., American National Bank Bldg., Wichita Falls, Texas—Gentlemen: The lease contract which you sent me under date of January 10, 1922, has been approved by my partner in the land near Iowa Park, and, except the following changes which have been inserted, is ready as written by you to deliver to the bank in Iowa Park, which you may select to hold the contract in escrow. The changes are as follow:

"Section 1. We add 'and one-eighth of all gas produced and saved on the leased premises.'

"Paragraph 2 and 3 have both been erased. The contract is executed as of January 18, 1922. We have set aside and assigned to you 160 acres, being the S. W. quarter of section 2, Tarrant county school lands in Wichita county, Texas.

"Please advise me promptly whether these changes and this acreage are satisfactory to you, and, if so, we will forward the lease and agreement to the bank designated by you. Before doing so, however, we would like to have you send us references concerning your own standing, and your ability to carry out your agreement. Very truly yours, [Signed] J. B. Cranfill."

"Dallas, Texas, February 2, 1922.

"Swann Petroleum Co., 1003 American National Bank Bldg., Wichita Falls, Texas—Gentlemen: Inclosed I am handing you a letter

which was sent to Wichita Falls and returned. I am trying it again. We are ready to play ball with you, as soon as you may reply to this letter. Very truly yours, [Signed] J. B. Cranfill."

"1003 American National Bank Bldg., Wichita Falls, Texas. February 3, 1922. J. B. Cranfill, 824 Wilson Bldg., Dallas, Texas— Dear Sir:. Replying to your letters of January 23 and February 2, 1922. The changes that you have made in the lease contract are acceptable to us. Matter of fact, an eighth basis for both oil and gas has been considered preferable, and, in most cases, has been more satisfactory to all parties than the ordinary form. Several landowners in this vicinity preferred the old form, which was our reason for executing yours in this manner. The lease, as it now stands, is agreeable to us and you may send the same, together with the contract, to the First National Bank of Iowa Park for my signature and to be held in escrow in that institution according to the terms of the contract. The Swann Petroleum Company is just a small organization. I am the sole trustee and look after the administrative end, while W. H. Champion is a driller of many years experience and is solely in charge of operations. This company owns its own tools and equipment which will be used in the drilling of the test well on the Peterson farm in section 13, and is financially able to handle its end of the contract. As to the ability and standing of the organization, I will vouch for its ability, and, in turn, give the following references as to my general reputation in this community: Hugh M. Larkum, Sec'y, Sunshine State Oil & Refining Company; F. L. Norman, Gen'l Mngr., Interstate Gasoline Company; D. L. Long, Sinclair Oil & Gas Company —all of Wichita Falls, Texas. We are now working hard in getting all of our equipment on the ground and setting up the machinery, and, with favorable weather conditions, should be drilling inside of ten days time. Yours very truly, Swann Petroleum Company, by [Signed] C. T. McLaughlin, Sole Trustee."

On February 4th the defendant Cranfill wrote the plaintiff stating:

"We are forwarding the lease contract to the First National Bank of Iowa Park, and are inclosing herewith carbon of our letter to the bank."

The carbon of the letter to the bank inclosed in Cranfill's letter states:

"Inclosed I am handing you a lease contract which is to be executed by the Swann Petroleum Company through its president or sole trustee, and left in your bank in escrow, to be held until we agree that it shall be released. When the Swann Petroleum Company has completed its test there, no matter which way it eventuates, we will be in a position then to dispose of this lease to them. But you will kindly hold it until you have advice from me for its release to them."

It seems that the lease was not inclosed in the letter to the bank. Subsequent correspondence discloses that the defendant Cranfill made known to plaintiff that the proposed lease had not gone forward to the bank. However, the carbon of Cranfill's letter to the bank, sent by him to plaintiff, acquainted plaintiff with the terms upon which he was willing to place the proposed lease in escrow. On February 6th plaintiff wrote to defendant Cranfill, acknowledging receipt of Cranfill's letter of February 4th and also a copy of his letter to the bank. In that letter the plaintiff said:

"Judging from your instructions to the bank, you have evidently misunderstood the plan that has been worked out among the various landowners contributing to this well, as regards the delivery of these leases. We now have escrowed, with the First National Bank of Iowa Park and the City National Bank of Commerce of this city, seven leases, together with the regular form contract, instructing the bank as to delivery, and in every instance the landowners have instructed the bank to deliver their leases to us immediately after we have spudded in this test."

The concluding sentence of the letter says:

"Please think this over and advise if this plan would not be just as convenient to you, and I assure you a great deal more satisfactory to us."

Defendant Cranfill wrote to the plaintiff on February 7th:

"Answering yours of the 6th I beg to advise that we have taken under advisement your suggestion about the date of the delivery of the lease and will let you hear from us soon again concerning it."

On the following day plaintiff replied by insisting upon the delivery of the lease upon the spudding in of the well and concluding by saying:

"We hope to hear from you soon, and that your decision regarding this lease will be in accordance with the contracts heretofore executed."

On February 9th defendant Cranfill wrote to plaintiff:

"After having thought the matter over at great length I am inclined to the opinion that it would be unwise for us to release the acreage out of escrow until you have drilled a well at least 2,000 feet deep. If this is satisfactory to you we will forward the lease to the bank with that understanding and agreement. You will be glad to know that my advice from Wichita Falls concerning Mr. McLaughlin are all creditable to him and this is reassuring and encouraging."

On February 11th plaintiff wrote defendant Cranfill a letter stating:

"We are truly sorry to note that you cannot see your way clear in instructing the bank to deliver us the 160-acre lease when we have spudded in this test."

The letter then suggested certain changes, one of which was:

"Should we meet with such serious reverses and misfortunes before attaining a depth of

1,800 feet that would necessitate our seeking assistance outside our own organization in completing this well, we feel that you should instruct the escrow agent to turn us this lease, provided we may gain such assistance by assigning this 160-acre lease or any part."

In the concluding portion of the letter the plaintiff says:

"If you will make the following (evidently meaning the foregoing) changes it will be appreciated and we assure you will encourage keenest co-operation on our part."

It seems that the defendant Cranfill did not respond to the plaintiff's letter of February 11th, and thereafter, on February 21st, plaintiff wrote defendant Cranfill another letter, saying:

"Will you kindly advise if our acceptance, as outlined to you in our letter of the 11th instant, is acceptable, and, if so, when same will go forward to the escrow agent? If, unacceptable, please outline your objections."

On February 24th the defendant Cranfill, wrote the plaintiff as follows:

"Referring to yours of the 11th we do not see our way clear to accept the changes you suggest, and hence think it best to call the whole matter off. We are, therefore, cancelling the suggested contract entirely. We hope that you will have good success in your well, but your plans do not suit us."

On February 25th plaintiff wrote to defendant Cranfill, reminding Cranfill that he had instructed the bank "to deliver this lease to us when the test well· on the Peterson farm was completed." And further saying:

"If you don't care to accommodate us by making the minor changes suggested we are forced, of course, to accept the contract in the same form that it was placed in the bank."

The· plaintiff and defendant Cranfill exchanged other letters, but we do not consider it necessary to give their contents, since they did not come to an agreement upon the matters in dispute.

[1] The appellant's first proposition is that plaintiff could not recover, because, whilst alleging itself to be a joint-stock association, it proved itself to be a trust estate, C. T. McLaughlin being sole trustee, in whom the cause of action, if any existed, was·vested. Defendants filed no sworn denial of the plaintiff's allegations that the Swann Petroleum Company was a joint-stock association. Under article 1906 no issue can be raised as to the right of the plaintiff to recover in the capacity in which it sues, unless the defendants' answer be verified by affidavit. We therefore overrule the proposition. Cheatham v. Riddle, 12 Tex. 112; Tolbert v. McBride, 75 Tex. 95, 12 S. W. 752; Kaack v. Stanton, 51 Tex. Civ. App. 495, 112 S. W. 706; Davis v. White (Tex. Civ. App.) 207 S. W. 679; Spelman v. Delano, 177 Mo. App. 28, 163·S. W. 302.

[2] Appellant's second proposition is that the correspondence between the plaintiff and defendant Cranfill, upon which alone plaintiff relied to establish the existence of·a contract, affirmatively shows that the negotiations conducted by such correspondence did not result in a contract in that the minds of the parties did not meet and agree. We sustain the proposition. In the first place there was no delivery of the contract tendered. The proposed agreement provided, in one paragraph, that all leases covering the field were to be deposited in escrow. This provision was confirmed in plaintiff's letter of February 25th, wherein it was said that the agreement with all the landowners, was that the plaintiff would not drill a well or take the leases out of escrow unless "all of the parties concerned" would contribute. In the first letter plaintiff informed defendant Cranfill that his "quota" was about 200 acres and that the leases were "escrowed" in the First National Bank of Iowa Park. A reasonable construction of the negotiations is that the parties contemplated that the execution of the lease contract would be accomplished by depositing the papers in the bank. The acceptance which plaintiff solicited was not mere assent but action—performance completed by delivery of an executed agreement to the bank.· That was the purpose of sending the defendant Cranfill a prepared contract. Delivery of the lease to the escrow agent was necessary to make an escrow contract. We think that defendant Cranfill's letter of January 23d disclosed an unwillingness to give effect to the lease contract as an escrow agreement, unless delivered to the bank. This fact is made significant by the statement in the letter that the lease contract "is ready * * * to deliver" to the bank. It is true the defendant said that if the changes made were satisfactory to the plaintiff it would forward the lease and agreement, but the promise to forward the papers was made with the express reservation that "before doing so" it would like to have references furnished concerning the plaintiff's ability and standing. Never at any time did defendant Cranfill make an unconditional delivery of the papers to the bank. Hence, if the parties understood, as we believe they did, that the escrow agreement was not to become binding as such until delivered with the lease to the bank, there was no contract.

[3] We recognize the rule that an agreement to do a certain thing, all the conditions of the postponed agreement being specified, is simply an agreement in præsenti. 6 R. C. L. 617, § 38; 13 C. J. 290, § 100. There is no question about the right of the parties to adopt, and become bound by law, the provisions of a proposed contract that is never formally executed. On the other hand, it the requested execution and delivery of the inclosed instrument was purposed to be the

consummation of the contract, and not the mere memorial of it, there was no binding agreement without such execution and delivery. Mississippi Steamship Co. v. Swift, 86 Me. 248, 29 Atl. 1063, 41 Am. St. Rep. 545. The question, says the Supreme Court of Massachusetts, in Lyman v. Robinson, 14 Allen, 242, is: Did the parties mean to contract by their correspondence, or were they only settling on the terms of an agreement in which they proposed to enter after all its particulars were adjusted, which was then to be formally drawn up and by which alone they designed to be bound. Brillhart v. Beever (Tex. Civ. App.) 198 S. W. 975. In the cases cited the courts say that care should always be taken not to construe as an agreement letters which the parties intended only as a preliminary negotiation. It is said in 1 Page on Contracts, 315, § 213, that whether the letters and telegrams which show that a written contract is contemplated are intended to take effect at once, or not to take effect until such contract is executed, depends on the intention of the parties as ascertained from the language used and from the surrounding facts and circumstances. Under the topic of "finality or completeness of assent," discussed in 6 R. C. L. 616, § 37, the author says:

"Whether the correspondence for the purpose of entering into a written contract is merely a preliminary negotiation or the contract itself, must be determined by the language used and the circumstances known to both parties under which the communications in writing are had."

The author says in the same paragraph that—

"The law does not make a contract when the parties intend none, nor does it regard an arrangement as completed which the parties thereto regard as incomplete." 6 R. C. L. 616, § 37.

On this point the Supreme Court of Michigan says:

"But a contract is not made so long as, in the contemplation of both parties thereto, something remains to be done to establish contract relations. * * * It is apparent that the council did not propose to enter into a contract for paving until it was satisfied that provision had been made for discharging the contract obligation. Becoming satisfied that it had not made the necessary provision, it refused to enter into a contract, the form of which it had approved, but which it had not, finally, bound the village to perform." Central Bitulithic Pav. Co. v. Highland Park, 164 Mich. 223, 129 N. W. 46, Ann. Cas. 1912B, 719.

It is manifest from all the correspondence that there was no unequivocal acceptance on the part of defendants. At no time did the minds of the parties meet. The concluding part of defendant Cranfill's letter of January 23d shows that the defendant approved the form of the contract, but that he was not willing to conclude the transaction by sending the papers to the bank until he had references furnished him. From our point of view, the defendant declined to act until he had an opportunity of ascertaining information regarding plaintiff's ability and standing. The retention of the papers by defendant, with this avowed limitation upon the acceptance of the contract, was a rejection in law and a renunciation of the plaintiff's offer. Flomerfelt v. Hume, 11 Tex. Civ. App. 30, 31 S. W. 679; Brillhart v. Beever (Tex. Civ. App.) 198 S. W. 973; National Bank v. Hall, 101 U. S. 43, 49, and 50, 25 L. Ed. 822; Minneapolis Ry. v. Columbus Rolling Mill, 119 U. S. 149, 7 Sup. Ct. 168, 30 L. Ed. 376; Montreal Gas Co. v. Vasey, Law Reports, App. Cas. (1900) 595; 1 Williston on Contracts, § 43. In this connection it is appropriate to quote from an opinion by the Supreme Court of the United States, wherein it is said:

"The rules of law which govern this case are well settled. As no contract is complete without the mutual assent of the parties, an offer to sell imposes no obligation until it is accepted according to its terms. So long as the offer has been neither accepted nor rejected, the negotiation remains open, and imposes no obligation upon either party; the one may decline to accept, or the other may withdraw his offer; and either rejection or withdrawal leaves the matter as if no offer had ever been made. A proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer, and puts an end to the negotiation, unless the party who made the original offer renews it, or assents to the modification suggested. The other party, having once rejected the offer, cannot afterwards revive it by tendering an acceptance of it." Railway Co. v. Columbus Rolling Mill, 119 U. S. 149, 7 Sup. Ct. 168, 30 L. Ed. 376.

If there was any uncertainty about the intention of the parties, all ambiguity was removed by the construction placed upon the negotiations by the parties in their subsequent correspondence, which showed a diverging of minds and not a meeting of minds. We therefore rule that plaintiff failed to establish the alleged contract. For this reason, the judgment of the trial court is reversed and rendered.