## NETHERLANDS AMERICAN STEAM NAV. CO. v. WAGNER.

(Circuit Court of Appeals, Second Circuit. June 1, 1926.)

No. 250.

1. Shipping ⬤⟳132(6)—Evidence held insufficient for jury as to whether contract of carriage existed as to particular shipment at time of redelivery by defendant as bailee to plaintiff's agent (Harter Act [Comp. St. §§ 8029–8035]).

In action by importer of linen against navigation company for breach of contract of carriage, arising on defendant's redelivery as bailee to plaintiff's father, his agent, in Rotterdam, of

goods which could not be shipped for want of permit, evidence *held* to show that relation of bailor and bailee existed at time of such redelivery, and insufficient to go to jury on question whether contract of carriage as to such shipment had been made, in view of Harter Act (Comp. St. §§ 8029–8035).

### 2. Contracts ⊜14.

Mere conversation or negotiation, without mutual intent to contract, does not produce a contract.

### 3. Contracts ⊜10(1).

Objection must be taken to a contract which may be unenforceable for lack of mutuality before it has been performed.

Mack, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Suit by John E. Wagner against the Netherlands American Steam Navigation Company for breach of contract. Decree for plaintiff and defendant brings error. Reversed.

Burlingham, Veeder, Masten & Fearey, of New York City (Roscoe H. Hupper, Everett Masten, and David B. Landis, all of New York City, of counsel), for plaintiff in error.

Graham, McMahon, Buell & Knox, of New York City (Edward Ward McMahon and Ralph P. Buell, both of New York City, of counsel), for defendant in error.

Before HOUGH, MANTON, and MACK, Circuit Judges.

MANTON, Circuit Judge. [1] The defendant in error, an American citizen at the times referred to, was engaged in the purchase and sale of linens in the city of Philadelphia, Pa. He had purchased from time to time linens in Germany, and imported them into the United States for sale here. The plaintiff in error is a steamship carrier engaged in transporting freight from Rotterdam to ports in the United States. The claim of the defendant in error is that in the month of September, 1914, he entered into a contract whereby he agreed to ship all linens that he might purchase in Europe on the steamers of the plaintiff in error from the port of Rotterdam to the United States, and that the freight was inferred to be the usual freight rates charged by the plaintiff in error. In November, 1916, 60 cases of linen were delivered to the plaintiff in error at Rotterdam for the purpose of transporting them to Philadelphia. Between September, 1914, and November 20, 1916, the defendant in error made various shipments of his merchandise on the ships of the plaintiff in error.

The contract alleged to have been made in September, 1914, is said to be an oral one, and is made out by a conversation had between a representative of the plaintiff in error and the defendant in error and his custom house broker. In that conversation it was said that the representative of the plaintiff in error stated that he could handle shipments from Rotterdam for the defendant in error, and the latter said it was his intention to have all shipments go that way, if the plaintiff in error could handle them. Its representative said it could, and thereupon the defendant in error asked the plaintiff in error's representative to notify his father, "who assembled the shipments out there [in Germany] for me," notifying the manufacturers when a shipment would leave, and also the time of sailing of shipments, and what was the best way to get the goods to Rotterdam at the Holland-American Line exactly as he had been doing. The charges were to be billed to the defendant in error. This instruction to the father of the defendant in error was to be given through the agency of the plaintiff in error at Rotterdam. The custom house broker corroborated this conversation. [2] This constitutes the contract as claimed by the defendant in error. The court charged the jury that, "unless you find that a contract was entered into between the plaintiff and defendant in Philadelphia in September, 1914, your verdict must be for the defendant." From this it will be observed that there was no understanding as to payment, except the customary freight, which the carrier was entitled to charge, and also its expenses for forwarding merchandise under bills of lading to be issued. At this time no contract for a specific shipment was referred to, and the purpose of the call at the plaintiff in error's agency was, as testified to by the plaintiff in error's custom house broker, for the purpose of arranging with the line to take care of goods that were to go to Rotterdam from Germany. There was no promise on the part of the defendant in error that he would ship all his merchandise over this line. There was nothing unusual or special in this inquiry as to shipping facilities or arrangements. A mere conversation or negotiation, without mutual intention to contract, does not produce a contract. First Natl. Bank v. Hall, 101 U. S. 43, 25 L. Ed. 822; City of Pocatello v. Fidelity & Deposit Co. (C. C. A.) 267 F. 181.

Apparently there was no occasion for any contract, so far as the defendant in error

was concerned, until the goods were ready for shipment, and then the usual contract was made by the issuance of a bill of lading for the particular shipment, which would state the freight and terms upon which the goods were carried, all in accordance with the Harter Act (Comp. St. §§ 8029–8035) which governs ocean transportation of goods into this country as well as out of it. It appears that the defendant in error did ship merchandise at various times up to November 20, 1916, the date when the .60 cases were left at the plaintiff in error's shipping pier in Rotterdam. Such shipments as were made were pursuant to bills of lading issued upon each occasion.

[3] We recognize the principle of law that objection must be taken to a contract which may be unenforceable for lack of mutuality before it has been performed. Willard v. United States, 262 U. S. 489, 43 S. Ct. 592, 67 L. Ed. 1086. But this principle has no application here, because, when each shipment was made, it was not made pursuant to any contract which was enforceable by reason of anything which was said at the time of the Philadelphia inquiry. The 60 cases which were delivered in November, 1916, were ordered by the defendant in error while he was in Germany. It took some time to manufacture them. He appointed his father his agent to arrange for their shipment in his behalf, and it was his agent who arranged for the delivery of the cases to the steamship company, although they were sent to Rotterdam by the manufacturer. His father made arrangements at the time of delivery for invoicing the goods, and was named in the invoice as the agent of the defendant in error. They were not sent forward, due to the fact that they were goods of German origin and required a permit, which was not obtained until June, 1918.

In the meantime, the goods were placed in storage with the plaintiff in error. During this time they were recognized as the goods of the defendant in error. He paid the insurance, storage, and freight charges thereon. But it was his father who acted as his agent, and who delivered the goods as bailor to the plaintiff in error. Until they could lawfully go forward under a contract of carriage, the goods were held by the plaintiff in error as bailee. After the goods had been held as such until October 31, 1917, at the written request of the father of the defendant in error, they were redelivered to him and sold. In his letter, the father stated that the defendant in error had been unsuccessful for 19 months in

obtaining a permit; that the war might last for 2 years longer, and for this reason, among others, he feared the goods might become worthless.

The agency of the father reasonably included his act of doing whatever was necessary for the preservation of the goods. If they had depreciated by reason of holding them, the agent would be at fault. If plaintiff in error had refused to redeliver them to the father, such depreciation as resulted might be its loss. The goods might not be held indefinitely at Rotterdam, merely because of the expressed intention to ship them to Philadelphia. Conditions and prospects which existed at the time of redelivery must be taken into consideration. The plaintiff in error's relationship to the goods up to this time was that of warehouseman, and this because of the possibility of transportation, which, of course, was its business. If, because of the lack of a permit, the goods might not go forward within a reasonable time, the plaintiff in error could redeliver the goods to any person authorized to receive them for the account of the defendant in error. So that, when it was reasonably determined that they could not go forward, the adventure of carriage became frustrated and was at an end.

Indeed, the father was the only representative of the defendant in error named by him in Europe. In the conversation in Philadelphia, arrangements for shipment were not made, but the plaintiff in error was told to deal directly with the father in making arrangements for the handling of the shipments. In this talk he was clothed with authority commensurate with the subject-matter to be arranged, and the circumstances affecting or likely to affect the same. The plaintiff in error could reasonably look to the father in ascertaining the orders of the defendant in error with reference to the disposition of the goods, when it was found impossible to send them forward. The purpose and intent of the parties was to bring the goods to the United States, not to keep them at Rotterdam. If they could not be transported, it was reasonable to conclude that they were much better off in the custody of the father. He might dispose of them, avoiding storage charges and expenses in Rotterdam, or, indeed, the loss of a falling market.

Under the law of Holland, which was proved, it was the legal obligation of the bailee to return the goods "to him who has intrusted the same to him, or to him in whose name the bailment was made or has been made, or to him who was designated in the

contract to receive the delivery thereof." Section 1756, Dutch Civil Code, 1008, 1009. And by section 1757 of the Dutch Civil Code it was provided that the bailee cannot require any evidence from the bailor that he is the owner, except that, if the property has been stolen and the true owner appears, he must give notice to the true owner that the same property has been bailed with him, together with an intention to make a demand for the same within a definite or sufficient time, and the bailee is legally discharged, after such notice, by surrendering the property to him from whom he has received it. The return of the goods to the father as a representative of the defendant in error concededly was made pursuant to the former's demand.

We hold the relations of the parties were those of bailor and bailee. There was no evidence to submit to the jury as to a contract having been made in Philadelphia by reason of the conversation with defendant in error's agent in September, 1914. The redelivery of the goods was pursuant to the order of the defendant in error, made through his agent in Rotterdam. Such redelivery is admitted, and it fulfilled all the obligations owed by the plaintiff in error to the defendant in error.

Judgment reversed.

MACK, Circuit Judge. Concurring in the legal principles announced, I dissent, because in my judgment, under the evidence, the jury were justified in finding a contract, and that the father had no express or implied authority to require delivery of the goods to him.