WILLIAM A. CARR, APPELLANT, *vs.* SAMUEL H. DUVAL AND
OTHÉRS, APPELLEES.

A decree for a specific performance of a contract to sell lands, refused, because a definite
and certain contract was not made ; and because the party who claimed the performance
had failed to make it definite and certain on his part, by neglecting to communicate by
the return of the mail conveying to him the proposition of the vendor, his acceptance
of the terms offered.
The case of Eliason *vs.* Henshaw, 4 Wheat. 225, cited, and the principles of the decision
re-affirmed.
If it be doubtful whether an agreement has been concluded, or is a mere negotiation,
Chancery will not decree a specific performance.

ON appeal from the Court of Appeals for the Territory of
Florida.

The case is fully stated in the opinion of the Court.

The cause was argued by Mr. Coxe and Mr. Webster, for the
appellant; and by Mr. Jones and Mr. Crittenden, for the appellees.

Mr. Justice CATRON delivered the opinion of the Court.

In October 1825, William Harris, of Montgomery, Alabama,
made his will, devising to his two sons, William and Stephen, the
tract of land in controversy ; lying on Lake Jackson, in Florida.
Stephen and William, at their father's death were both minors; and
William soon after died, leaving two brothers and three sisters, who
are his heirs; and two of whom were infants when this bill was
filed, and two of them married women. The land was unimproved
and undiv ded. In the fall of 1835, William A. Carr, the com-
plainant desired to purchase the land, and applied to Stephen W.
Harris for the purpose, by letter; he Carr, residing in Georgia.
The letter of Carr, opening the correspondence, is not in the record,
but the answer to it is sufficiently explanatory. The answer is
dated August 17th, 1835; in which Stephen W. Harris says, his
father left the land to his young brother and himself, that his
brother had died long since, and he had just come of age, and was
entitled to half the land, which could be divided at any time; "and
my half," says he, " is for sale, but it has first to be divided; my
price for that is ten dollars per acre." " The remaining half is
owned by the brother and sisters of said brother, and I believe they
are willing to sell, and their price, I expect, is ten dollars. Before
any part of the land, short of the whole tract could be sold, it would
first have to be divided; the whole could be sold so, and our price
is ten dollars."

The next letter from Stephen W. Harris to complainant, is dated
December 15th, 1835, acknowledging the receipt of one the day be-
fore from complainant, requesting to be informed of the quantity of

G 2

[Carr vs. Duval et al.]

the land. The answer stated it to be two thousand one hundred and thirty-one and one-fourth acres; and proposed to take Carr's offer for it, with interest on the last note, having two years to run.

On January 2d, 1836, Harris acknowledged the receipt of another letter from Carr, dated the 25th December, preceding. "I have," says he, "come to the determination to sell you the land on the terms you mentioned:" and then asks to be informed when, and where they shall meet to make the necessary arrangements.

The letter of Carr of the 25th December, referred to, offers to exchange some lands of his in Georgia, (which, he says, he had previously described,) rated by him at twenty thousand dollars, for the Florida lands, he giving three thousand dollars difference; or, he would make the same offer he had previously done. What this offer was, appears by Harris' letter of the 16th January, 1836; and as this letter is the conclusion of the correspondence, so far as Harris was concerned, and is the principal evidence relied on to establish the agreement, it becomes necessary for the purposes of its proper understanding, and to ascertain the sense in which the parties understood it, to set it forth, together with the answers to it, of the 3d and 19th of February.

"*Montgomery, January 16th, 1836.*

"Mr. WILLIAM A. CARR.

"Sir—Yours of the 12th instant, is just received, and in reply have only to remark, that I will accede to your first proposition, as stated in my last letter: that is, one-third cash, the balance in two equal instalments, with a mortgage on the land—the last two payments to be made in cash—and as all the heirs live in the neighbourhood of this place, it will be the only place where we can conveniently meet to close the bargain: I wish to know your decision per return mail, as I have three other offers for the land, and can sell it immediately if you do not wish to take it."

"*Athens, February 3d, 1836.*

"Mr. STEPHEN W. HARRIS.

"Dear Sir—Yours of the 16th January, I received upon my return from Augusta, and, according to your request, hasten to answer it, and, for answer, say, that I am still as desirous as ever of taking the land, and have considered myself bound to you for the money, and you as equally bound to me for the titles to the land; but as there was in my mind, at least, some doubt to which of my propositions you had acceded, I thought it best to write again, and be definitely informed on that subject, for the reasons stated in my last. It will be out of my power to go to Montgomery, as my family is sick: my wife, who has been confined, took cold, by leaving her room too soon after her confinement, and upon my arrival at home found her quite sick; although better, is still too unwell for me to leave home just at this time; and our Court commencing here next week, I shall have to remain until that is over: then I am

[Carr *vs.* Duval et al.]

compelled, if my wife's health permits, to go immediately to Florida, as you have, no doubt, heard of the distressing situation of the country there in consequence of the Indian hostilities; so you will have to get all the parties interested in the land together, which I suppose you can easily do, as you say they all live in the neighbourhood, and have the titles perfected to me; and in doing so, the titles must be conjointly by all the heirs interested in the land, made and executed; and those who have families, their wives must assign over and relinquish their right of dower to the same; and when it is, that is, the title, properly executed, one of you can carry it or send it to me, or some agent at Tallahassee, and receive the first payment for the same, and my notes for the balance of the purchase money, and the mortgage on the land, which suits me better than personal security; and in order that the business may be more properly executed, yourself and Judge Field had better be in Florida, for I shall require the boundaries of the land to be defined, so that I may know where the land lies, and when I am on my own land; as well as avoid getting on any of my neighbour's land. Will you be pleased to state what are the offers made you, and by whom, as you say in your last letter you " have three other offers for the land ;" be good enough to state explicitly by whom they are made, what is the amount of each offer, and the payments. I ask this as it cannot now make any difference to you, as I consider this matter closed between us; in other words, I consider the trade as made between us, which puts the land entirely out of the market. Any further communication between us will have to be sent to me to Tallahassee, Florida, as the mail communication between this and Montgomery, is so uncertain, that an answer would not reach here until I should be gone to Florida. If you would prefer to remain at home until you know certainly when I would be in Florida, I will write, on my arrival there, to you, and inform you when to meet me or go on there; the latter plan will, perhaps, be more desirable to you. I must here inquire if any part of this tract has been taken off or sold to any person, as I have understood by some it contained two thousand three hundred, and by others, two thousand four hundred acres; but you always told me in our correspondence you would not divide it. Shall I hear from you at Tallahassee, as an answer would reach me there by the time I reach there ?"

" *Macon, February 19th,* 1836.

" MR. STEPHEN W. HARRIS.

" Dear Sir—You will perceive, by the date of my letter, I am thus far on my way to Florida, where, if no accident prevents, I shall reach there in the course of five days more, where I hope to see you and have our business brought to completion, where I can pay you the first payment, most of which I have had for some time, and take a title to the land. I have been delayed starting as early as contemplated, from circumstances entirely beyond my control; but soon, now, I hope, I shall be able to comply, on my part, and

hope, ere this, you have received my last letter, and had the title completed according to directions, viz., to have all the heirs interested in the land to join you in the title, and those who have wives, to have them, their wives, to assign over and relinquish dower to the same; and you can start for Tallahassee as soon as you please.''

The letter of Harris, when taken in connexion with the former letters, has no ambiguity in it; he was acting not for himself only; but his sisters and a brother, without any express authority from them; he could have none such from three of the joint owners—two infants and one a feme covert.

There was therefore only one probable way in which the bargain could be closed; that is, by a title bond, or deed, on the part of Stephen W. Harris, his brother and brother-in-law; the married adult sister joining in the deed, should one be made, and a covenant by others, as sureties, that the infant heirs should convey when they came of age.    This would have been a very responsible suretiship, and not at all likely to have been undertaken by others than the family or neighbours of the parties; and hence, at Montgomery, was the only place (in the language of the letter of the 16th January) where the bargain could be conveniently closed; indeed, it was the only place where there was the slightest probability of closing at all.

It is obvious, Stephen W. Harris had carried on the correspond-·ence upon his own judgment, without consultation with most of the other defendants, as to details; under the general understanding in the family that they would take for their portion of the land the same price he saw proper to take for his.    In the correspondence, the price and times of payment were stated; and it was required that a mortgage should be given on the land for the two last annual instalments; but what other security would be required was left open: so it was left open, what security would be given to Carr for the title.    Where and how it should be made was the great difficulty in closing the agreement.    So far as the infant sisters were concerned, it was a difficulty that Stephen W. Harris had probably not seriously thought of; and was first met with when he set about making deeds in pursuance of the complainant's letter; with which Harris found it impossible to comply.    He was taught by experience, what would at first have prevented most men of age and business habits from proposing to contract for the sale of the lands of infant sisters, who would probably marry before they became of age; and if the land should increase in value, their husbands would refuse to sanction the contract.

But was the letter of the 16th of January an agreement on behalf of Stephen W. Harris?    Complainant's purpose was to establish a cotton farm, or to procure lands fit for such an establishment.    He obviously did not wish to purchase lands in an undivided state; nor did he make any proposition to purchase Stephen W. Harris's undivided interest; it would have been unfit for occupation in this

condition. The proposition was, to purchase the whole; nor did Stephen W. Harris offer to sell less than the whole, before a partition should be made between him and his sister and brother. The idea of encumbering the title of the latter with a tenant in common, in possession, and cultivating the land in an undivided state, was of course rejected by Mr. Harris: so he distinctly informed Mr. Carr. The idea of a partial sale and purchase not entering into the contemplation of either party, we must construe the letter of the 16th of January in reference to this undoubted intention. Mr. Carr was bound to know that the statute of frauds was in force in Florida, and no doubt did know the fact; we take it for granted he did, and that the agreement for the sale of the land must be in writing, signed by the parties to be charged. How then was it possible he could understand the letter of the 16th of January to be a complete and concluded agreement, even had it been simply accepted? He is told, all the heirs reside in the neighbourhood of Montgomery, and in effect that it is the only place where they can meet to close and conclude the bargain. Now if the bargain was already made, as the bill assumes, why meet to close it? The truth is prominently apparent from the face of the letter, what the intention of Harris was; and nothing but the serious aspect given to it by the pleadings and arguments, would have induced the Court to explain this note of a few lines, which it must be admitted is almost as likely to be obscured as elucidated by the attempt. We think no man of ordinary capacity could have been so far mistaken as to believe the heirs of William Harris bound by the letter of the 16th of January; nor even that Stephen W. Harris was bound thereby: the object of the purchaser and vendor being a joint sale, and that only; the owners of four-tenths of the estate being no parties to the letter; two of them infants, and another a married woman, who were incapable of assent, and gave none in fact, so far as this record furnishes any evidence. We therefore think it clear that this was merely a treaty for a sale and purchase of the land, not perfected into an agreement; 11 Ves. 599; and that the letter does not import to be a contract. 2 Simons and Stuart, 194.

But suppose the letter of the 16th January had bound Stephen W. Harris, and if it was possible under the circumstances to compel him to partial performance so far as he had title; what effect did the letters from complainant to him of the 3d and 19th February, have on that of the 16th January?

On the 3d of February, nineteen days after the proposition was made in the letter of the 16th of January, (and which demanded an answer by return of mail,) the complainant replied; not that he accepted the proposition as made; (an indispensable part of which was that he should immediately come to Montgomery, and there close the bargain;) but that his family was sick; that he had a Court to attend; then, if his wife's health permitted, he had to go to Florida: and of course, could not come to Alabama at all; and "so," says he, "you will have to get all the parties interested in the land

together, which I suppose you can easily do, as you say they all live in the neighbourhood, and have the titles perfected to me ; and in doing so, the titles must be conjointly by all the heirs interested in the land, made and executed ; and those who have families, their wives must assign over and relinquish their right of dower." And then complainant instructs Stephen W. Harris to send or bring the deed to Tallahassee, to complainant, or to some agent of his. He also requires, that the boundaries of the land shall be defined ; and concludes by asserting that he deems the agreement closed, and the land out of the market. The first payment complainant proposed to make at Tallahassee, in Florida ; and there to execute the contract on his part, by giving his notes for the two remaining instalments, and a mortgage on the land.

The additions to this acceptance of the proposition of the 16th January, are so numerous and important as to hardly need comment ; when it is recollected that complainant was dealing for the property, in part, of infants and married women.

It was impossible a conjoint deed could be executed : three of the parties had no power to make such a deed ; and complainant required a conjoint one by all the heirs interested in the land, and this made and executed before he would undertake to comply with his part of the proposed agreement. Furthermore, it was to be made in Alabama ; there signed, sealed, and witnessed, and then to be delivered in Florida.

The infants, of course, could only act in receiving the money by guardian ; of course, the guardian in Alabama might well question his authority in Florida.

That the land should be defined, was also a change ; but whether amounting to a rejection of the proposition of the 16th of January, was there no other objection to the acceptance, we shall not stop to inquire.

But if nothing else stood in the way, the time of the acceptance is conclusive of the complainant's claim. The letter of the 16th January desired an answer by return of mail ; why, is distinctly stated. Three other propositions to purchase the land had been made. No answer came by return of mail : and not until twenty days after was an answer put in the mail ; and by that the parties were directed to meet complainant at Tallahassee, not immediately, but presently, of which he was to give them information. By the terms of the acceptance the time of meeting rested in the discretion of the complainant. He claimed, by his letter of the 3d February, the contract to have been concluded ; and, therefore, could, according to his construction of it, take his own time to order the respondents to meet him in Florida : and by his note of the 19th February, he does give them vague instructions of the time.

We think the assumption of the complainant thus to construe his acceptance, utterly unwarrantable. The rule laid down by this Court in Eliason *vs.* Henshaw, 4 Wheat. 228, is, that an offer of a bargain by one person to another, imposes no obligation upon the

former, unless it is accepted by the latter, according to the terms in which the offer is made; and that any qualifications of, or departure from the terms, invalidates the offer, unless the same be agreed to by the person who made it. Until the terms of the agreement have received the assent of both parties, the negotiation is open, and imposes no obligation on either. The party offering to sell or buy has the right to dictate the terms in regard to the time when the proposition shall be accepted, as well as to other material circumstances; nor would the Court be astute to inquire after the reasons why a time for acceptance was fixed. The case cited from 4 Wheaton is full to this point. In the case before the Court, the reasons lie at the surface. Three other persons were offering to purchase, and it was all-important to know the determination of the complainant at the earliest day. A stronger case for a prompt answer could hardly be presented. Nor do the circumstances set up in excuse by the complainant, such as the situation of his family, the necessity of attending a Court, or of going to Florida; alter the case. The complainant, Stephen W. Harris dictated, as he had the power to do, an answer by return of mail; and if no answer was had by the return of mail, he was free to contract with another.

If it be doubtful whether an agreement has been concluded, or is a mere negotiation, Chancery will not decree a specific performance; the principle is a sound one, and especially applicable in a case like this, where the party attempting to enforce the contract has done nothing upon it. Haddleston *vs.* Brisloe, 11 Ves. 522.

It is useless to inquire, in this suit, under what circumstances, partial performance, with compensation, could be decreed, as no case is presented for splitting up the contract. Stephen W. Harris offered to sell the whole, and complainant to buy the whole. Nor need we inquire wnether Duval and Shepherd were innocent purchasers; the other defendants having had the right to sell, Duval and Shepherd had the right to buy, of which the complainant had no just grounds to complain.

We, therefore, order the decree to be affirmed, with costs.