## PRESSED STEEL CAR CO. v. HANSEN.

### (Circuit Court, W. D. Pennsylvania. February 29, 1904.)

### No. 13.

1. MASTER AND SERVANT—INVENTIONS BY EMPLOYÉ—RIGHT OF EMPLOYER TO PATENTS.

An obligation on the part of an employé to assign to his employer patents obtained for inventions made in the course of his employment does not arise from the relation of employer and employé, but can only be created by an express contract.

2. PATENTS—PAROL CONTRACT TO ASSIGN—VALIDITY AND ENFORCEMENT.

A parol agreement to assign the right to obtain a patent for an invention is valid, and, when established by sufficient proof, may be specifically enforced in equity.

3. SPECIFIC PERFORMANCE—PAROL CONTRACT—SUFFICIENCY OF PROOF.

To authorize a court of equity to decree the specific performance of a parol contract, not only the contract itself, but its terms, must be clearly proven.

4. PATENTS—AGREEMENT TO ASSIGN. TO EMPLOYER—EVIDENCE TO ESTABLISH.

The fact that an employé assigned to his employer the right to patents applied for by him for inventions made in the course of his employment does not alone warrant an inference that he was bound by a contract to assign all such inventions, especially where his action is reasonably explained on other grounds.

5. SAME.

Evidence considered, and *held* insufficient to establish a contract by an employé to assign to his employer the patent rights in inventions made by him in the course of his employment, either express or implied.

In Equity.

Bakewell & Byrnes, Knox & Reed, John R. Bennett, and W. C. Strawbridge, for complainant.

Kay & Totten, Geo. H. Christy, D. T. Watson, and Geo. B. Gordon, for respondent.

BUFFINGTON, District Judge. This is a bill in equity, brought by the Pressed Steel Car Company against John M. Hansen to compel him to transfer to it six applications, or the patents issued thereon. The complainant is engaged in the manufacture of steel cars. The respondent was its chief engineer when the inventions in question were made. The allegations upon which the complainant bases its right to the relief sought are, in substance, set forth in its bill as follows: That Hansen was for several years previous to the complainant's incorporation employed by the Schoen Manufacturing Company, its successor, the Schoen Pressed Steel Company, and finally became chief engineer of the last-named company; that complainant succeeded to the business and good will of the Schoen Pressed Steel Company, whereupon Hansen "entered your orator's employ as its chief engineer, under an agreement and understanding to devote his entire time, ability, and skill to your orator's business and its advancement, and that all inventions and improvements that

¶ 1. See Master and Servant, vol. 34, Cent. Dig. § 71; Patents, vol. 38, Cent. Dig. § 125.

he might make during the period of his employment, and all letters patent that might be obtained therefor, should be the sole property of your orator"; that "it was a condition of his employment as chief engineer, and in part consideration of the salary paid him as such, and his employment as such implied, and was upon the express understanding and agreement by him, that all designs, inventions, and improvements that he might make or develop while in your orator's employ, and all letters patent that might be obtained therefor, should become and be the sole and exclusive property of your orator, and that for all such designs, inventions, and improvements, if found or regarded as patentable, he would, from time to time, as he made or developed such designs, inventions, or improvements, disclose the same to your orator's solicitor, and, through him, and at your orator's expense, make all necessary and proper applications for letters patent, and execute all necessary and proper papers to that end, and that he would, from time to time, as such applications were executed and filed, likewise execute and deliver to your orator, with such applications, properly executed assignments of all such applications, inventions therein specified, and letters patent that might be granted thereon and therefor, with directions to the Commissioner of Patents to issue all such letters patent to himself as assignor to your orator of all his right, title, and interest in and to all such letters patent, which should be the entire right, title, and interest therein; that, such being the terms and conditions of the respondent's employment by your orator, and in full appreciation and consideration therefor, and of the inventions and improvements that he might make and letters patent that he might obtain therefor, he was paid by your orator a salary at the rate of $4,000 per year to January 1, 1900, at the rate of $5,000 per year to September 1, 1900, at the rate of $6,000 per year to October 1, 1901, and at the rate of $10,000 per year down to January 1, 1902, when he left your orator's employ"; that thereafter, and while performing his duty as chief engineer, he made the inventions in question, and made application for patenting the same; that he subsequently left the employment of complainant, and refused to assign the same. On the part of the respondent it is explicitly denied there was any contract, express or implied, to assign these patents.

The law applicable to this case falls within a narrow compass. The obligation of an employé to assign to an employer an invention made in the course of his employment does not arise from the existence of the relation of employé and employer alone, but there must be in addition a contract to assign. Thus, in Dalzell v. Dueber Mfg. Co., 149 U. S. 320, 13 Sup. Ct. 888, 37 L. Ed. 749, it is said:

"A manufacturing corporation, which has employed a skilled workman, for a stated compensation, to take charge of its works, and to devote his time and services to devising and making improvements in articles there manufactured, is not entitled to a conveyance of patents obtained for inventions made by him while so employed, in the absence of an express agreement to that effect. Hapgood v. Hewitt, 119 U. S. 226 [7 Sup. Ct. 193, 30 L. Ed. 369]."

It will thus be seen that the agreement by the employé inventor to convey is the obligation which compels him to convey.

In view of this fundamental requirement it becomes our duty to inquire whether such contract is established by the proofs in this case. That a contract to assign may be by parol, and, if established, will be enforced, is settled. As said in Dalzell v. Dueber, supra,

"An oral agreement for the sale and assignment of the right to obtain a patent for an invention is not within the statute of frauds, nor within section 4898 of the Revised Statutes [U. S. Comp. St. 1901, p. 3387], requiring assignments of patents to be in writing; and may be specifically enforced in equity upon sufficient proofs thereof. Somerby v. Buntin, 118 Mass. 279 [19 Am. Rep. 459]; Gould v. Banks, 8 Wend. 562 [24 Am. Dec. 90]; Burr v. De la Vergne, 102 N. Y. 415 [7 N. E. 366]; Blakeney v. Goode, 30 Ohio St. 350."

It will be noted, however, that, this being a bill for specific performance, the terms of the contract to be enforced should be clearly proven. Thus, in Colson v. Thompson, 2 Wheat. 336, 4 L. Ed. 253, cited approvingly in the Dalzell v. Dueber Case, it was said:

"The contract which is sought to be specifically executed ought not only to be proved, but the terms of it should be so precise as that neither party could reasonably misunderstand them. If the contract be vague or uncertain, or the evidence to establish it be insufficient, a court of equity will not exercise its extraordinary jurisdiction to enforce it, but will leave the party to his legal remedy.'"

Where it is doubtful whether an agreement has been concluded, and unless the proof is clear and satisfactory both as to the existence of a contract and as to its terms, specific performance will not be enforced. Carr v. Duval, 14 Pet. 79, 10 L. Ed. 361; Nickerson v. Nickerson, 127 U. S. 668, 8 Sup. Ct. 1355, 32 L. Ed. 314; Hennessey v. Woolworth, 128 U. S. 438, 9 Sup. Ct. 109, 32 L. Ed. 500. Turning, then, to the proof, we inquire whether the complainant has met this standard. The answer traverses the allegation of a contract, and the burden is therefore upon the complainant to overcome such denial, and prove the contract by a preponderance of proof. 1 Daniell's Chancery Pr. and Pl. 850. It will be observed that the bill avers the contract sought to be enforced was made when Hansen entered the employ of the Pressed Steel Car Company. The testimony of Mr. Hoffstot, the principal witness for complainant, is explicit that he has no personal knowledge that such a contract was then made. "I did not employ Mr. Hansen, when he first came to the Pressed Steel Car Company, as chief engineer, and I was not a director of the Pressed Steel Car Company at the time he first entered its employ." In view of this statement, the denials of Hansen:

"Q. I believe, Mr. Hansen, that while you were in the employ of the Pressed Steel Car Company you had something to do with certain inventions which were or might possibly be useful in that company's business? A. I did. Q. I wish you would state whether or not there was any agreement or understanding or arrangement of any sort, either verbal or written, between yourself and that company, as to the ownership of any inventions which you might make or did make while in its employ? A. I have no knowledge of any."

And of Mr. T. C. Schoen:

"Q. At the time that the Pressed Steel Car Company was organized, who employed Mr. Hansen as chief engineer, and by whom was it determined to so employ him? A. I was at the head of the Schoen Pressed Steel Company at the time of the formation of the Pressed Steel Car Company, and the whole organization of the new company was substantially taking over the old or-

ganization, so that I do not recall that there was any specific appointment made. There was no formality observed about making any specific appointments. I probably consulted with the manager and vice president, and we decided that Mr. Hansen should be the chief engineer. Q. At whose request was Mr. Hansen appointed assistant to the president, and what were the reasons that led to this appointment? A. He was of great assistance to the president in the negotiation of contracts. I don't think it was at anybody's request. I appointed him. I don't recall that anybody requested me to do it. Q. Was there any agreement made between Mr. Hansen and any of these three companies as to the ownership of inventions relating to cars, or parts thereof, that should be made by him during the time he was in the employ of any one of the companies? A. There was not."

—It is clearly shown that no contract was made by Hansen with the complainant company. Although not so alleged in the bill, it is now, however, contended that such a contract is established by the fact that Hansen had been under a contract with the Schoen Pressed Steel Company providing for assignment of patents, and that he assumed the same duties and incident contract obligations when he became chief engineer in the complainant company. Thus Mr. Hoffstot was asked:

"You have stated that you have no personal knowledge of the terms and conditions on which Mr. Hansen was first employed as chief engineer of the Pressed Steel Car Company. Do you know how he came to be employed by the Pressed Steel Car Company as its chief engineer, and what knowledge have you of the terms and conditions under which Mr. Hansen passed over from the Schoen Pressed Steel Company as its chief engineer to the Pressed Steel Car Company as its chief engineer?"

To which he replied:

"The only knowledge I have is that he (Mr. Hansen) has told me and what the Schoens told me at the time, namely, that all their employes of the Schoen Pressed Steel Company were on the same basis that they had been employed with the old concern, as the Schoen Pressed Steel Company's shareholders were largely in the ascendency in the holdings of the stock of the Pressed Steel Car Company."

He was asked also:

"To make this clear, you were not personally present when Mr. Hansen was employed as chief engineer of the Pressed Steel Car Company, were you?"

To which he answered:

"No. As I have stated before. Mr. Hansen's employment as chief engineer of the Pressed Steel Car Company was simply a holdover, as were the others above referred to. * * * I have stated that I was not personally present, but I have been told by both Mr. Hansen and Mr. Schoen, as well as Mr. Finckel, and a great number of others passed over, and to the best of my knowledge and belief there was no formal time when Mr. Hansen and any one of the people left the Schoen Pressed Steel Company and were formally engaged with the Pressed Steel Car Company."

Mr. C. T. Schoen's and Mr. Hansen's testimony in that regard are quoted above. Assuming, for present purposes, that Hansen's employment by the complainant impliedly imposed on him all contract obligations he was under to the Schoen Pressed Steel Company, we next inquire whether Hansen had contracted to assign patents to that company. No witness was called who was present at the making of such a contract, or had personal knowledge of it or its terms. Mr. Hoffstot says explicitly, "I was not present when Mr.

Hansen was engaged as chief engineer of the Schoen Pressed Steel Company." He bases his belief that there was a contract upon what Mr. C. T. Schoen and Mr. Hansen told him in that regard. Clearly, what Schoen said in Hansen's absence is not competent to establish a contract on Hansen's part. But not only is Hoffstot's proof in regard to such declarations denied by both Hansen and Schoen, but, in addition to this, we think the statements of Mr. Schoen, even if competent, do not necessarily show the existence of a contract by Hansen to assign patents. In other words, Schoen's statements are reconcilable with the fact that Hansen was not under contractual obligations to assign. First taking up the question of the existence of a contract, we have, as we have seen, the testimony of C. T. Schoen, the president of the Schoen Pressed Steel Company, that there was no contract with Hansen; that of Hansen to the same effect; of Fraser, the assistant treasurer of the Schoen Company, and subsequently auditor of the complainant, who testified that as auditor of the complainant he had charge of all the company's contracts, and had never heard of any contract with Hansen; of W. H. Schoen, the secretary or treasurer of the Schoen Pressed Steel Company during its whole existence, that he was consulted in connection with Hansen's appointments and promotions, and that he knew of no "agreement, verbal or otherwise, with Mr. Hansen, requiring him to assign to any one of these three companies any inventions or improvements he might make in steel cars or parts thereof." Another witness, E. A. Schoen, was connected with all three companies, having been superintendent and general manager of the Schoen Manufacturing Company, later of the Schoen Pressed Steel Company, and general manager and a vice president of the complainant up to January, 1901. Referring to Hansen, and in answer to the question, "When he was advanced from one position to another in these different companies, had you anything to do with his promotion?" he says, "All of his promotions all the way through were decided upon by Mr. C. T. Schoen and Mr. W. H. Schoen and myself." He further testified:

"Q. Was there any agreement made between Mr. Hansen and any of these three companies as to the ownership of inventions made by him relating to the car or parts of cars during the time that he was in the employ of any one of the companies, to your knowledge? A. There never was any such agreement. Q. During the time you were connected with the company, or any of these companies, was it understood that part of the consideration of the salary paid to Mr. Hansen was based upon an agreement that Mr. Hansen should assign any invention made by him to the company? A. There never was, as far as I know. Q. At the time of the formation of the Pressed Steel Car Company, when Mr. Hansen was appointed chief engineer of that company, which ones of the officers of that company consulted together and determined upon Mr. Hansen's appointment as chief engineer? A. Mr. Charles T. Schoen, Mr. W. H. Schoen, and myself. Q. Was Mr. F. N. Hoffstot connected with the company at that time, and was he consulted in any way as to the appointment of Mr. Hansen as chief engineer? A. Mr. Hoffstot at that time was merely a stockholder, and consulted in no way about any appointment made by the company."

In addition to the above, Mr. De Armond, who was secretary of the Schoen Pressed Steel Company from July, 1896, to January,

1899, and of the complainant until August, 1901, and whose official position and duties required him to know of such contracts, testified that he never heard of such a contract by Mr. Hansen. After a careful study of the testimony, we are justified in finding, and do find, that by the clear weight of the evidence no express contract by Hansen with the Schoen Manufacturing Company or the Schoen Pressed Steel Company to transfer patents existed.

It is, however, contended that the existence of such a contract is shown by what is termed the "King incident." It seems that Messrs. King, Allman, and Hansen, while employed by the Schoen Pressed Steel Company, devised an improvement for car doors, and applied for a patent. An office search showed the device was anticipated, and the application was abandoned. Prior to this abandonment Mr. Charles T. Schoen was informed by the three of the improvement, and of the intention to charge his company royalty for its use. The incident and its alleged bearing will appear from the following testimony of Mr. Hoffstot:

"Q. What knowledge have you as to the subject of the assignment of said inventions and said applications for letters patent therefor, during the period of employment of Mr. Hansen by the Pressed Steel Car Company, and from what source or sources did you derive that knowledge? A. I knew that the patents were being taken out by him, and assigned by him to the company, and the knowledge was received from the records of the company, as well as his statements from time to time. Q. From what person or persons other than Mr. Hansen, if any, did you derive said knowledge? A. As to the patents which he took out from the Pressed Steel Car Company, as I said before, from the records of the company, and as to what is known as the 'King incident,' from Mr. Charles T. Schoen. Q. Please explain what you mean by the King incident? A. To Mr. George I. King and Mr. Hansen and another man, whom I can't think of for the moment, having attempted to take out a patent on their own account, and then claim a royalty from the Schoen Pressed Steel Company. Q. Did this King matter occur during the existence of the Schoen Pressed Steel Company, or after the formation of the Pressed Steel Car Company? A. Before the formation of the Pressed Steel Car Company. Q. When did this conversation occur with Mr. Schoen—before or after the formation of the Pressed Steel Car Company? A. Mr. Schoen first told me about this incident about the time it happened, and referred to it at different times since then, and the first occurrence was prior to the formation of the Pressed Steel Car Company. Q. In referring to this King incident, what did Mr. Schoen say to you? A. He stated that these three young men had attempted to do some patenting on their own account, and that he told them very plainly, but firmly, that he would not have any one working for the Schoen Pressed Steel Company that was getting out patents who did not assign them to the company in exactly the same manner as he did, and expressed himself at considerable length on the justness of this demand, and stated that one of the young men had left on that account, but that John M. Hansen was smart enough to realize that he (Schoen) was right, and remained. He also referred to this incident many times after in speaking of Mr. Hansen."

Clearly, these declarations of Schoen, made in the absence of Hansen, are not evidence to affect the latter, and must be disregarded. Assuming their competence for present purposes, let us examine the testimony of the participants. Mr. King, a witness for complainant, gives this version of what followed the meeting:

"Q. When did you have the next conversation with Mr. Hansen about this matter, and what did he tell you? A. To the best of my recollection, the next conversation with Mr. Hansen on this subject was had on the day following

our interview with Mr. Schoen above referred to. The substance of Mr. Hansen's conversation with myself was to the effect that Mr. Schoen had called him into his office that afternoon, and told him that he would have to do one of two things—either assign the application for a patent on this door mechanism to the Schoen Pressed Steel Company, or get out; and do one or the other damned quick, as I recollect it. Mr. Hansen and I then discussed the situation, and I told him that personally it was a case of leaving at once, whereupon I arranged to do that, and gave him my verbal resignation on the spot. Q. Did Mr. Hansen, in this conversation, the day following the conversation with Mr. Schoen, state what grounds Mr. Schoen had taken for the position that the invention should be handed over to the company or you should get out? A. My recollection on this point is that Mr. Hansen reported to me that Mr. Schoen did not propose to have any inventions of that sort taken out by employés of the company, and that they would have to be assigned to the company in any similar case."

On the other hand, Schoen's account is :

"Q. Please state how this matter was brought to your attention, and what took place in connection with it. A. As I recollect it now, Mr. King and Mr. Hansen called on me at the hotel in Pittsburg where I was stopping, to talk about this device. I invited them to dinner, and Mr. King did the principal part of the talking about it. I gathered the impression from his talk that his motive was to get some money out of the company. I said very little, if anything, regarding the subject. Later I had a talk with Mr. Hansen, and advised him it was not wise for him to be mixed up in that matter. I advised him that he had a bright prospect in the future with our company, and it would be wise on his part to not get mixed up with other men who were not in the same relationship as he with the management of the company; that I considered him one of the young men I had picked out to be of some account, and that he had better not have anything to do with it. These two men left of their own accord shortly afterward. Q. Did you state to Mr. Hansen that you would not have any one working for the Schoen Pressed Steel Company that was getting out patents who did not assign them to the company? A. I did not, nor did I talk with him on that line at all. I talked to him in the most friendly spirit. Q. Did you ever state to Mr. Hoffstot that you had told Hansen very plainly, but firmly, that you would not have any one working for the Schoen Pressed Steel Company that was getting out patents who did not assign them to the company in exactly the same manner as you did? A. I have no recollection of making any such statement to him. There never was an occasion, to the best of my knowledge, for me to speak in that tone to Mr. Hansen in all my connection with him."

Hansen's account is :

"Q. Well, now, I wish you would state what the conversation was that you had with Mr. Schoen. A. Well, Mr. Schoen told me that he was not going to pay us any royalty on any patents we took out; that if Mr. King or I decided that this company should pay royalty, why he wouldn't stand for it; and he told me, as far as I was concerned, he thought it was a matter I ought to drop anyhow. He made no demands for me to do so; he simply left it to my own judgment. Q. Did he say to you that you would have to assign the patent to the company? A. No, sir; he did not. Q. Did he say anything to you about having to quit the company unless you did? A. No, sir. Q. When you met King, what did you tell him? A. I told him that I had seen Mr. Schoen, and he wasn't going to stand for any royalties. He said, well, he wouldn't let him use it without any royalty, under any consideration. He would rather quit, and stick to what he considered his rights in the patent; and, as he stated in this testimony, he quit within thirty minutes."

Assuming, however, that Mr. King's statement is correct, and that Mr. Schoen's statement, as made to Mr. Hoffstot, is competent and established, they do not necessarily show the existence of any contract by Hansen to assign. Indeed, if anything, they show the con-

trary, for Schoen did not insist on an assignment by virtue of a contract to assign, but on prompt assignment as a condition of continued employment. Indeed, King recognized this, and resigned. If the patent had been granted, it would not be contended King was under any obligation to assign it, and no more was Hansen. As to the latter, no inference can be drawn from his continuance with the company. He never did assign his interest in the patent, and with the abandonment of the application the matter ended. At most, we think this incident only showed that Schoen demanded, if improvements were made by an employé, he would not continue to employ the inventor unless he assigned such patent to the company; but it by no means follows that his employé had not the option to decline to assign, terminate his employment, and hold his patent.

It is also contended the conduct of Hansen in assigning or joining with C. T. Schoen in assigning patents to the company recognized the existence of a contractual obligation on his part to do so; in other words, that his acts are inexplicable unless based on a contract. The contention is thus stated in complainant's brief:

"This evidence of appreciation is something extraordinary, and does not appeal to the sober, sound sense of intelligent business men. If this respondent received a salary which was only commensurate with the duties performed by him as an ordinary employé, and was not expected to transfer or assign the results of his inventive genius, it is unreasonable to suppose that he would, out of the goodness of his heart, or as the result of a generous impulse, have transferred numerous valuable patented inventions to his employer, the Pressed Steel Car Company."

Assuming, for present purposes, such a course of conduct may avail to establish the existence of a contract, we are of opinion that, in view of the facts shown in this case, it does not necessarily imply one. Hansen gives this explanation of his assignments:

"In order to make the matter clear, I wish to say that, as already stated, my business career practically dated from my connection with the Schoen Manufacturing Company. I was always very closely associated with Mr. C. T. Schoen, and I looked upon the Schoen Manufacturing Company and the Schoen Pressed Steel Company as being Mr. Schoen's property. I always felt that all the advancement I received in the way of position and salary was through him, and my future I felt was practically in his hands as long as I was connected with him, and my intentions always were to stay with his interests. I knew very little about the habits and customs on the question of assignments at the start, but as I was being pushed along I later on felt what I was getting was very largely through Mr. Schoen, and, as already stated, I intended to follow the business right along. The question never occurred to me as to whether or not I should assign the patents. I simply did it as a matter of routine, and I felt it was one way of showing appreciation. * * * During my employment with the above companies [all three] I really gave the matter no thought; that is, gave the matter no thought to figure out what my rights were. * * * The first application was a joint application—Mr. C. T. Schoen and myself—and when the papers were prepared and forwarded to Mr. Schoen he executed them, and they were then turned over to me, and I noticed that the papers were to be signed by me, and I did so. In that way this practice was established and became sort of a routine matter, and one that I gave no thought."

His other acts are in keeping with motives to which he attributes his acts in assigning patents to these companies. He assigned numerous foreign patents taken out on his inventions to the Trans-

portation Development Company, a corporation handling the pressed steel car business abroad. Admittedly, he was under no contract so to do, and no reason or interest is suggested for his doing so, except that such company was composed of Mr. C. T. Schoen and other persons largely interested in the complainant company. It is shown that every increase in salary and promotion came to him unsought. Moreover, his conduct evinces commendable, if not, indeed, unusual, loyalty to the company. When his services were sought by railroad interests, and a salary of $3,000 in excess of what the complainant was paying him was offered, he announced his purpose was to stay with the complainant company, and did not make the railroad offer a basis for exacting increased compensation. His testimony in that regard—and it is not denied by Mr. Friend—shows such loyalty:

"A. That letter was a letter written by Mr. Underwood [the representative of the Erie Railroad] to Mr. Friend, advising him that he was going to make me an offer, and that he was writing Mr. Friend in the interest of fair play; that he did not want to rob him of any of his employés without giving him due notice. Q. What took place then, after he had given you the letter? A. As already stated, I told Mr. Friend that I knew he had received the letter, or rather that Mr. Underwood had spoken to me, and he remarked: 'Now, Frank [meaning Mr. Hoffstot] hasn't seen that yet, and I haven't said a word to him about it. Now, what do you think about it? What are your ideas?' Well, I said that would be an entirely new field for me, and I never had any particular desire to get into the railroad business. I was always pretty well satisfied with the manufacturing end, and I had about made up my mind that, after consultation with them, I would not accept it. We talked along that line. Mr. Friend evidently forgot himself, and remarked, when I told him I had decided not to accept it, that is just exactly what he and Frank thought about the matter when they talked it over this morning (meaning the morning of that day. Then Mr. Friend remarked: 'Now, John, we understand that you are going to stay with us.' I said, 'Yes, as far as I know, I will not accept that position.' Q. Was anything said about salary at that time? A. We were about, as I thought, to leave that subject, when Mr. Friend got up, and tapped me on the shoulder, and said, 'John, you are a funny fellow; now is your chance to ask for more money.' And I said, 'I don't care to do that.' It was up to my employer to decide whether I was worth more money or not. I never had asked for more money, and I didn't propose to do so with them, and he said: 'Well, now, I tell you, you have got most of the business right in your vest pocket, and if anything should happen to you where would we be? I will make you a proposition: If you will arrange to get a good assistant, a bona fide assistant, as soon as you do that I will raise your salary from six to eight thousand a year.' I also told him that I had been trying to get a man to assist me for some time. I didn't want to feel that the increase in salary was any particular incentive to me to get an assistant, because I had been trying to do that."

Considering that the respondent in this case, from a draftsman at $6 a week has been rapidly promoted, and his salary increased from time to time, without his request, we think he had good grounds for feeling grateful towards those who had advanced him. Thus feeling, regarding his own future as linked to the man who had befriended him, and knowing the latter was a large stockholder in the company, we think his conduct in assigning these patents may be attributed to other motives than a contractual obligation. And, even if such motives were not shown to exist, the failure of the assignor to stand on his rights as to the assignment of other patents should not be

ground to infer a contract to transfer a later one which he refuses to assign. What was said in Fuller & Johnson Manufacturing Company v. Bartlett, 68 Wis. 73, 31 N. W. 747, 60 Am. Rep. 838, is here pertinent:

"Stress is laid upon the fact that the defendant assigned to Fuller & Johnson an earlier patent. It may be that he did so without knowing his legal rights. It may be that he did not comprehend his legal right to the invention in question until about the time of his quitting the plaintiff's employment. Still the question presented is whether the facts disclosed raise an implied agreement to assign the patent to the plaintiff absolutely. This is not to be inferred from the mere passivity of the defendant."

After careful consideration of the proofs, we have reached the conclusions: First, that no express contract by Hansen to transfer patents is proved to have been made; second, that the facts proven are not such as to warrant the presumption that a contract existed; and, third, that no implied contract to transfer arises from the relation between the parties.

A decree will be drawn dismissing the bill.