## JONES v. PATRICK et al.

### (Circuit Court, D. Nevada. May 7, 1906.)

### No. 788.

SPECIFIC PERFORMANCE—PAROL CONTRACT—MEASURE OF PROOF REQUIRED.

To entitle a complainant to a decree for the specific performance of a parol contract, the evidence must be clear and satisfactory both as to the existence of the contract and as to its terms.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Specific Performance, § 389.]

In Equity.

Haven & Haven and Harvey Yeamon, for complainant.
Key Pittman and Curtis H. Lindley, for defendants.

HAWLEY, District Judge (orally). The general character of this case is stated in Jones v. Patrick (C. C.) 140 Fed. 403, to which reference is here made. At the trial there was a conflict in the testimony of the respective parties as to the precise terms of the oral agreement. On October 8, 1903, before this agreement was made, which was on the 18th of October, 1903, Patrick had secured an option on certain mines (now owned by the combination company), the price therefor being $75,000; $5,000 of said sum was to be paid on or before October 26, 1903, the date of the expiration of the option. After securing this option Patrick made an agreement with one Hubbard of Chicago to sell seven-eighths of the mining claims, reserving an eighth interest; Hubbard to pay the money on the option at the times therein specified. A short time prior to the date fixed for the payment of the $5,000, correspondence between Patrick and Hubbard (acting for himself and other parties) had developed the fact that he wished Patrick to obtain an extension of time; this could not be secured, and it became extremely uncertain whether Hubbard could or would raise the $5,000 within the time mentioned in the option. Patrick had throughout the entire transaction acted in the belief that if this payment was made there would be no trouble in securing the money for the other payments as they became due, because he thought it could be taken out of the mine, but he was worried and troubled over the prospects of his getting the $5,000. He endeavored to secure this money from other persons, without success, so as to be prepared if Hubbard failed to meet his agreements. He had offers from two or more other parties to take the option off his hands on substantially the same terms, but then considered he was under obligation to Hubbard, if their original agreement was complied with. As the time approached for the payment, he feared the deal with Hubbard would fall through; in this extremity he called in Jones, they being friends, and having confidence in each other, and they were interested together in a similar enterprise. Patrick knew Jones was a great rustler, and thought he might be able at the last moment to get the $5,000. They talked the matter over, with the result that Jones went to San Francisco. While there he claimed to have secured a purchaser, and was to get the money the

next day; but on that evening, after the arrangement was made, he received a dispatch from Patrick that Hubbard had closed the agreement. The question whether Jones could have secured the $5,000, if no such dispatch had been received, is, from all the testimony given upon this point, left doubtful and uncertain.

The admitted agreement between Jones and Patrick was on somewhat different lines, and more favorable to Patrick, than the agreement Patrick had made with Hubbard. Jones' testimony was substantially to the effect that they should work together, and if either of them secured a purchaser, they should share equally.

"Q. With regard to that contract made between you and Mr. Patrick * * * what was Mr. Patrick to do in relation to the matter, what were his duties? A. He was to stay in Tonopah, and I was to go to San Francisco, we were both to work hand in hand; he had absolutely failed to place it, he had no one to place it with; he could not get away himself, he had to stay there, and he thought that I was better, it was better for me to go to San Francisco, with the understanding that we were to divide whatever interest we secured in the property. Q. When you say 'we' you mean both together, or you separately? A. Both of us; if I placed it or if he placed it, it didn't make any difference who placed it; he took me into the partnership; he was worrying because he was afraid the option would fall through, and it would give him a bad standing. * * * I was to share equally, it didn't make any difference who took the property; as soon as he got his telegram from Mr. Hubbard he took me in on the deal with him."

Patrick's version of the agreement with Jones is, in substance, that if Jones succeeded in raising the $5,000, he was to have an eighth of the property, and that he (Patrick) was to have one-fourth, and that the agreement between them "was contingent on his making the deal." There was one witness, who had been called in as a stenographer to typewrite letters of recommendation from Mr. Patrick to certain parties calculated to aid Mr. Jones in his efforts to get a purchaser. In his testimony, among other things, he said:

"Q. Was there any discussion between Mr. Jones and Mr. Patrick at the time these letters were dictated with reference to the contents of these letters? A. Yes, there was, they discussed the deal and discussed the fact that they intended to sell a five-eighths interest and retain a three-eighths interest, and Mr. Patrick stated that he wanted a quarter, and Mr. Jones said that he wanted an eighth, and there was further discussion with reference to how much money they expected to raise, and the merits of the property, and so forth. * * * Q. Was there anything said in the conversation there to the effect that Mr. Jones should receive any interest in this property unless he made a sale? A. Not in my presence there was nothing said about that. * * * The Court: State what was said by them in regard to that? A. Well, I can't remember exactly, the substance of the conversation was that Mr. Jones was to go to San Francisco, I don't know whether that was mentioned—apparently it had been discussed before, and the substance of it was that Mr. Patrick stated that he wanted to retain * * * a quarter * * * and there was no discussion as to any possible contingency if Mr. Patrick was to place the property, in my presence. * * * Q. Was there anything said at that conversation with regard to what, if anything, Mr. Jones was to do in consideration of receiving an eighth interest? A. Well, Mr. Patrick stated if he sold the property, if he could place the property he could have an eighth interest, or words to that effect."

In a letter from this witness addressed to Mr. Jones, in answer to inquiries made of him, he said:

"It was discussed between Patrick and Jones that a five-eighth interest was to be placed with any one putting up the initial payment of five thousand, after which the mine would pay for itself, and that they, Patrick and Jones, would retain a three-eighths interest. Patrick told Jones to do the best he could. Patrick had advice from the Marquette Exploration Company that they could not handle the property, which was discussed. Patrick's efforts to place the property had failed up to that time. The matter was discussed at length between Patrick and Jones and it was my understanding that Jones was in on the deal."

There were many details in the testimony as to statements made by Patrick and Jones at different times to divers persons, and as to other matters, tending more or less, to corroborate, strengthen, or weaken the testimony of Patrick and Jones. The credibility of the respective witnesses is equal. None of them can be said to be unworthy of credit. Weighed in judicial scales the testimony of each side stands upon a level. Complainant is not required to prove his case beyond a reasonable doubt, but the law imposes upon the complainant the necessity of establishing his case by a preponderance of evidence. It is equally well settled that in cases of this character, resting solely upon oral agreements, the evidence to justify the court in enforcing them, must be clear, satisfactory, and convincing. If parties making agreements of this character thoroughly understood the importance of this question, they would take the pains to make a memorandum in writing in clear and definite terms just what the agreement was, so as to avoid the shoals of danger and difficulty of proving their agreements by the uncertain memories of witnesses depending solely on their recollection.

In Morrow v. Matthew (Idaho) 79 Pac. 197, 201, which was of a similar character to the case in hand, the court said:

"The courts have quite generally held that, in order to enforce the specific performance of a parol contract, it must be clearly and satisfactorily shown to the trial court as to its execution and the terms and conditions thereof. If the contract has not been reduced to writing, it must of necessity require a greater weight of evidence to establish its existence, and the terms and conditions thereof, and in those respects satisfy the mind of the court, than if the contract were in writing and produced in evidence. * * * Neither the amount of testimony, nor its contradictory or corroborative nature, constitute the leading or controlling elements in satisfying a court or jury as to the existence or nonexistence of the fact in issue. It is rather the convincing character and quality of the evidence concerning the particular fact in dispute."

In Pressed Steel Car Co. v. Hansen (C. C.) 128 Fed. 444, 446, the court said:

"Where it is doubtful whether an agreement has been concluded, and unless the proof is clear and satisfactory both as to the existence of a contract and as to its terms, specific performance will not be enforced. * * * Turning, then, to the proof, we inquire whether the complainant has met this standard. The answer traverses the allegation of a contract, and the burden is therefore upon the complainant to overcome such denial, and prove the contract by a preponderance of proof."

This case was affirmed upon appeal in Pressed Steel Car Co. v. Hansen (C. C. A.) 137 Fed. 403, 406.

In McKee v. Higbee, 180 Mo. 263, 297, 79 S. W. 407, the court said:

"It must be conceded that if the contract was in fact made, as alleged in the petition, a court of equity will specifically enforce it, but in actions to enforce contracts of that character, there is but one uniform expression by this court—that the proof of the contract must be clear, cogent and convincing. The rule, as to the nature and character of the proof, which will authorize the chancellor, in decreeing a specific performance of a contract, is a very strict one, and correctly so. The party who comes into a court of equity asking a contract specifically enforced, must come prepared to make it clear that such a contract not only exists, but, as well, the terms of it, that the court may intelligently, by its decree, enforce such contract strictly in accordance with its terms. No case for specific performance can rest upon doubtful or uncertain testimony."

The testimony in this case, taken in its entirety, does not, in my opinion, march up to the standard of proof required by the rules of law applicable to such cases in order to enable complainant to sustain the averments in his bill.

Let judgment be entered in favor of defendants for their costs